188 F.3d 1141 (9th Cir. 1999)
 In re: CHRISTOPHER W. ETTELL, aka CHRISTOPHER W. ETTEL; MARLA ETTELL, aka MARLA ETTEL, aka MARIA ETTEL, Debtors.
HOUSEHOLD CREDIT SERVICES, INC., Appellant,
v.
CHRISTOPHER W. ETTELL; MARLA ETTELL, Appellees.
 No. 98-15592
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 14, 1999--San Francisco, California
Filed August 24, 1999
 
 John A. Graham, Jeffer, Mangels, Butler & Marmaro, Los Angeles, California, for the appellant.
 Christopher W. Ettell, Pro per, Lafayette, California, for the appellees.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel; Ollason, Russell, and Hagan, Judges, Presiding. BAP No. NC-97-01465-OlRuHa.
 Before: Warren J. Ferguson, Sidney R. Thomas, Circuit Judges, and Garr M. King,[1] District Judge.
 THOMAS, Circuit Judge:
 
 
 1
 Household Credit Services claims that Christopher Ettell engaged in credit card fraud and ought to be denied a bankruptcy discharge. However, we agree with the Bankruptcy Appellate Panel ("BAP"), and affirm its decision that the debt was dischargeable.
 
 
 2
 * Ettell was a licensed automobile broker, operating a sole proprietorship known as Personal Motor Services. California law required Ettell to deposit funds paid by customers for car purchases in a trust fund separated from the business's operating funds. See CAL. VEH. CODE S 11737 (West Supp. 1999). Although aware of this requirement, Ettell began diverting client trust funds to sustain his declining business.
 
 
 3
 By the spring of 1995, Ettell had misappropriated a total of $155,000, and criminal charges were filed against him. In 1996, Ettell was convicted of violating CAL. VEH. CODE S 11737 and, as a consequence, his broker's license was revoked in March, 1996.
 
 
 4
 During this time period, Ettell acquired a significant amount of additional debt. He refinanced the home that he had purchased in 1994. By the end of December 1995, Ettell's unsecured nonproprietary debt was $496,000. Of that amount, approximately $70,000 was credit card debt.
 
 
 5
 The debt requiring our attention is that accrued on the credit card issued by Household Credit Services ("Household"). From December 20, 1995, through the filing of the petition for bankruptcy, he incurred charges of $7,542.64 on the card. Prior to his December statement, Ettell's balance was $14.95. During the January monthly billing cycle, he made $4,987.12 in purchases. In the February billing cycle, he made an additional $2,038.73 in purchases, and made a payment of $300. His March statement reflects a final purchase in the amount of $23.00. He made no payment that month. After that time, Ettell made no purchases or payments on the card, and the finance charges continued to accumulate, bringing his total balance to $7,542.64 on July 31, 1996.
 
 
 6
 On that date, Ettell and his wife filed a joint voluntary Chapter 7 petition in the bankruptcy court. At the time of the filing, Ettell claimed total assets of $508,135, and total liabilities of $1,778,704.43. Included among the liabilities was Household's claim for $7,542.64, for charges incurred by Ettell from December 20, 1995 through the filing of his bankruptcy petition.
 
 
 7
 Household filed a complaint in the United States Bankruptcy Court challenging the dischargeability of the Ettells' debt. Household alleged that Ettell had fraudulently incurred the credit card debt with no intention of repaying it, and that the debt was therefore nondischargeable pursuant to 11 U.S.C. S 523(a)(2)(A) (1998).
 
 
 8
 Appearing in propria persona at the discharge hearing, Ettell testified that he had incurred the credit card debt for home improvement, hoping to enhance his home's value to secure refinancing. He indicated that he would use the loan proceeds to repay misappropriated funds so that he might retain his broker's license. Ettell additionally testified that when he incurred the credit card debt, he still possessed his professional license and had anticipated at least $120,000 in income. He testified that he had taken on a second job as a marketing representative for a car dealership. This job became his sole source of income when his professional license was suspended in March of 1996, and his income was reduced by half.
 
 
 9
 At the conclusion of the hearing, the bankruptcy judge issued oral findings of facts and conclusions of law holding the debt dischargeable. On appeal, the BAP affirmed.
 
 II
 
 10
 The central purpose of the Bankruptcy Code is to "provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future efforts, unhampered by the pressure and discouragement of preexisting debt.' " Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (internal quotations omitted). However, the Act limits this opportunity to the "honest but unfortunate debtor." Id. at 287.
 
 
 11
 One of the limitations placed on the discharge of debts is at 11 U.S.C. S 523. In relevant part, that provision states:
 
 
 12
 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . .
 
 
 13
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud . . . .
 
 
 14
 11 U.S.C. S 523(a)(2)(A).
 
 
 15
 In interpreting "actual fraud" as it appears in this provision, the Supreme Court has instructed the courts to "look to the [common law] concept of actual fraud" as it was understood in 1978 when that language was added to section 532(a)(2)(A). Thus, in order to establish a debt's nondischargeability under the section, the creditor must show:
 
 
 16
 (1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations.
 
 
 17
 Citibank v. Eshai (In re Eshai), 87 F.3d 1082, 1086 (9th Cir. 1996); see also American Express Travel Related Services Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir.), cert. denied sub nom Hashemi v. American Express Travel Related Serv. Co., 520 U.S. 1230 (1997). A creditor must prove actual fraud by a preponderance of the evidence. See Grogan, 498 U.S. at 286.
 
 
 18
 The element at issue in this case is fraudulent intent, that is, whether Ettell made the credit card purchases with the intent and purpose of deceiving Household. Establishing fraudulent intent can prove quite difficult in credit card cases, because it normally involves transactions between the debtor and third parties; the debtor rarely makes a representation directly to the credit card creditor. See Eshai , 87 F.3d at 1087. In cases like these, to paraphrase Sandburg, fraud comes in on little cat feet.
 
 
 19
 To identify intent from pattern, we have adopted an analysis that allows inference of the debtor's fraudulent intent from "the totality of the circumstances." See Hashemi, 104 F.3d at 1125-26; Eshai, 87 F.3d at 1087. In assessing "the totality of the circumstances," we are guided by consideration of twelve, non-exclusive factors derived from Citibank v. Dougherty (In re Dougherty), 84 B.R. 653, 657 (B.A.P. 9th Cir. 1996). See Eshai, 87 F.3d at 1087-88[2].
 
 
 20
 Although we have endorsed application of these factors, we have emphasized that "these factors are nonexclusive, none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent." Hashemi, 104 F.3d at 1125. "So long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." Id.
 
 
 21
 Given this analytic framework, we must reject House hold's argument that the bankruptcy court erred as a matter of law by not making express findings as to every Dougherty factor. We have never imposed such a requirement; indeed, to do so would contradict our interpretation of the factors as non-exclusive and non-dispositive. See Hashemi , 104 F.3d at 1125. Although it would aid appellate review if the bankruptcy court explained its reasoning in greater detail, the bankruptcy court did not err in declining to articulate its specific analysis as to each of the twelve factors.
 
 
 22
 The subtext of Household's argument is that the Dougherty factors ought to provide the exclusive means of assaying fraudulent intent. However, we expressly rejected this notion in Anastas v. American Savings Bank (In re Anastas), 94 F.3d 1280, 1284-85 (9th Cir. 1996). Just as a debtor's testimony about his subjective intent is not by itself legally dispositive,[3] neither are the objective inferences drawn from consideration of the Dougherty factors. Because fraud lurks in the shadows, it must usually be brought to light by consideration of circumstantial evidence. In that context, the Dougherty factors provide a useful means of objectively discerning intent based on the probabilities of human conduct. Dougherty does not handcuff the trier of fact, who is in the best position to balance the objective evidence against the witness's testimony and credibility. Totality of the circumstances means totality of the circumstances[4]. Eshai remains the law of the circuit.
 
 
 23
 We must also reject Household's invitation for us to repudiate the bankruptcy court's determination that Ettell did not act with fraudulent intent. The finding of whether a requisite element of section 523(a)(2)(A) is present is a factual determination we review for clear error. See Anastas , 94 F.3d at 1238. A finding of fact is clearly erroneous, although there is evidence to support it, when the reviewing court, after carefully examining all the evidence, is "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.
 
 
 24
 The bankruptcy court's determination, upheld by the BAP, that Ettell did not act with fraudulent intent, is not clearly erroneous. Ettell incurred the purchases on his credit card at a time when he thought he might still retain his professional license. Throughout the period in question, Ettell continued to work, and even took on a second job in order to improve his financial situation. Further, as we previously noted, the expenditures that Ettell madewere undertaken in the hopes that he could refinance his house. Ettell continued to make payments on the credit card debt until his professional license was revoked. He did not file for bankruptcy until he had exhausted the administrative remedies available to him for regaining his license.
 
 
 25
 Certainly, a strong argument may be made that if one examined Ettell's financial situation objectively, he was unlikely to be able to repay the credit card debt. However, this factor alone is not dispositive, as Anastas held. 94 F.3d at 1285-86. Thus, when we consider the Dougherty factors and the remaining considerations that form "the totality of the circumstances," we cannot say that the bankruptcy court's finding constituted an impermissible view of the evidence. Therefore, it was not clearly erroneous.
 
 
 26
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Garr M. King, United States District Judge for the District of Oregon, sitting by designation.
 
 
 [2]
 These factors are: (1) the length of the time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of charges made; (5) the financial condition of the debtor at the time the charges were made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospect for employment; (10) the financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. See Dougherty, 84 B.R. at 657.
 
 
 [3]
 In issuing its decision, the bankruptcy court seemed to suggest that subjective intent might be dispositive under Anastas. This misreads Anastas. Anastas held that incurring debt while objectively unable to repay did not dispositively establish a debtor's fraudulent intent. 94 F.3d at 1285-86. This is entirely consistent with a "totality of the circumstances" approach, in that it requires that intent be ascertained through an analysis of all of the surrounding circumstances, rather than just one factor. Anastas, 94 F.3d at 1286 n.3; see also Hashemi, 104 F.3d at 1125-26. Read together, our decisions in Eshai, Anastas, and Hashemi simply mean that the debtor's subjective intent must be evaluated in light of objective factors. Because no single objective factor is dispositive, assessment of intent is thus left to the fact-finder.
 
 
 [4]
 Household also contends that the BAP committed legal error by suggesting, pursuant to Anastas, that the scienter requirement of S 523(a)(2) precluded consideration of reckless conduct. We do not read the BAP's decision to say that. If so, it would be an improper construction of Anastas. Although Anastas used the phrases "bad faith" and "intent to defraud," it also made clear that reckless conduct could be sufficient to establish fraudulent intent. See Anastas, 94 F.3d at 1286 ("reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit."). Nevertheless, even if erroneous, the BAP's reference was in dicta and does not constitute reversible error.