# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

---

99-6062NI

---

In re: Teresa A. Grause

      Debtor

Universal Bank, N.A.

      Plaintiff - Appellant

          v.

Teresa A. Grause

      Defendant - Appellee

\*
\*
\*
\*
\*
\*   Appeal from the United States
\*   Bankruptcy Court for the
\*   Northern District of Iowa
\*
\*
\*
\*
\*

---

Submitted: January 27, 2000
Filed: February 16, 2000

---

Before KOGER, Chief Judge, DREHER and KISHEL,[1] Bankruptcy Judges.

---

KOGER, Chief Judge.

---

     [1] The Honorable Gregory F. Kishel, United States Bankruptcy Judge for the District of Minnesota, sitting by designation.

Universal Bank, N.A. ("Universal") appeals the decision of the Bankruptcy Court[2] finding in favor of Debtor Teresa A. Grause on Universal's nondischargeability action under 11 U.S.C. § 523(a)(2)(A) and declaring the debt to be dischargeable. For the reasons that follow, we affirm.

Facts

Ms. Grause opened her account with Universal in April 1992, as a result of a pre-approved credit card application. Her FICO score at that time was 762, well above the minimum score of 650 required to obtain a Universal Card. At the time she opened her account with Universal in 1992, Ms. Grause had a job earning roughly $8.50 per hour but in 1994, she was forced to find other employment because her position was being moved to another state. Her current job as an accounts payable clerk pays a slightly higher hourly wage than the former job did, but her health insurance premiums for herself and her children are quite a bit higher at the new job. In addition, unlike the former job, Ms. Grause's current job does not permit her to earn overtime pay. Thus, starting in 1994, Ms. Grause suffered a modest decrease in her take-home pay. Ms. Grause is a single mother of two teenage daughters who live with her in Sioux City. She receives no child support for either of her daughters and her annual salary is roughly $18,000.

Over the years, Ms. Grause used her Universal credit card for relatively minor purchases and cash advances and although she generally made the minimum payments on the account, she often had a rather significant balance on the account. She also maintained significant balances on her other credit cards over the years as well. The original credit limit on the Universal card was $2,000, based on her income of $18,000 and credit history, but the limit was gradually increased over the years until she reached a credit limit of $5,700. Universal's witness testified that the increases in Ms. Grause's credit were due to Ms. Grause's good credit history, which was based on FICO scores and payment history on the Universal account, and that the increases were made despite Universal's knowledge that her income had not increased over the years.

In early 1997, Ms. Grause fell behind on several payments on the Universal account and consequently, Universal terminated her ability to take cash advances against the card. As a result, although she could make charges on the account for services and merchandise, she was no longer permitted to take

---

[2] The Honorable William L. Edmonds, United States Bankruptcy Judge for the Northern District of Iowa.

cash advances on the card. The cash advance privilege was never reinstated on the account, even after she subsequently paid down the balance.

On June 19, 1997, Ms. Grause made a payment on the Universal account in the amount of $5,400, which was the result of a balance transfer to her MBNA credit card. This brought her balance on the Universal account down to $167.82. Shortly thereafter, in September 1997, Ms. Grause obtained a $22,000 home equity debt-consolidation loan from which she paid off her MBNA account and another loan. The interest rate on the home equity loan was almost 20%.

Since Universal never removed the restriction regarding cash advances, no further cash advances were taken against the account after the pay-down. Nevertheless, Ms. Grause used her Universal card quite heavily for purchases after the pay-down. She made numerous purchases (sometimes multiple charges on a single day), but almost all of the charges were relatively small in amount. The majority of the charges were made at stores such as Wal Mart, grocery stores, gas stations, and lower-end clothing and shoe retailers. Ms. Grause also made a few charges at fabric stores and she testified at trial that she tried to save money by making some of her daughters' clothing, including her elder daughter's homecoming dress. The Universal statements reveal a few charges to fast food restaurants as well.

Ms. Grause made the minimum required payments for the first three or four months after the pay-down, but she soon became unable to make even the minimum required payments and started making only partial payments on the account, causing her account to be past due on partial amounts of the minimum required payments. This activity continued on the card over the next several months until she exceeded her credit limit in April 1998. Universal closed the account due to nonpayment and being over limit in May 1998.

Sometime around May 31, 1998, Providian, another credit card creditor, served Ms. Grause with a 30-day notice to cure and after receiving no payment, Providian sued her on that account on July 7, 1998. She met with a bankruptcy attorney on July 29, 1998, and paid her attorney on August 3. Providian moved for summary judgment in its state court action on August 14, 1998. Ms. Grause signed and filed her bankruptcy petition on August 18, 1998, listing some $22,000 in credit card debt on her schedules.

Universal filed this action alleging nondischargeability under § 523(a)(2)(A) based on the heavy activity on the Universal card in the few months after making the large balance transfer payment on the account. The Bankruptcy Court conducted a trial, after which the Court announced from the Bench that the debt was dischargeable because Universal failed to prove intent and justifiable reliance. The Bankruptcy Court subsequently entered a Proceeding Memo and Order entering a Judgment summarily conforming to the decision orally announced. Universal appeals.

## Standard of Review

We review findings of fact for clear error and legal conclusions *de novo*. See O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.), 118 F.3d 1246, 1250 (8th Cir. 1997); Hartford Cas. Ins. Co. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 214 B.R. 197, 199 (B.A.P. 8th Cir. 1997); see also Fed. R. Bankr. P. 8013. Because the Bankruptcy Court applied the correct legal principles and standard for nondischargeability under § 523(a)(2)(A), our review of its factual findings thereunder is under the clearly erroneous standard. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed.746 (1948); accord In re Waugh, 95 F.3d 706, 711 (8th Cir. 1996); Chamberlain v. Kula (In re Kula), 213 B.R. 729, 735 (B.A.P. 8th Cir. 1997). Furthermore, "[i]f the bankruptcy court's account of the evidence is plausible in light of the entire record viewed, it must be upheld even though we may have weighed the evidence differently had we been sitting as the trier of fact." Forbes v. Forbes (In re Forbes), 215 B.R. 183, 187 (B.A.P. 8th Cir. 1997) (citing Anderson, 470 U.S. at 573-74, 105 S.Ct. at 1511). When there are two permissible views of the evidence, we may not hold that the choice made by the trier of fact was clearly erroneous. In re Lemaire, 898 F.2d 1346, 1349 (8th Cir. 1990).

## Discussion

Section 523(a)(2)(A) provides an exception to discharge for any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by --

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

In order for a debt to be declared nondischargeable under § 523(a)(2)(A) for fraud, the creditor must show, by a preponderance of the evidence: (1) that the debtor made a representation; (2) that she made the representation at a time when she knew the representation was false; (3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representation; and (5) that the creditor sustained a loss as the proximate result of the representation having been made. Thul v. Ophaug (In re Ophaug), 827 F.2d 340, 342 n.1 (8th Cir. 1987), as supplemented by Field v. Mans, 516 U.S. 59, 116 S. Ct. 437, 446, 133 L.Ed.2d 351 (1995); see also Merchants National Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).

In its decision announced from the Bench, the Bankruptcy Court determined that Universal had failed to meet its burden of proving either intent or justifiable reliance. We believe the record contains sufficient evidence supporting both of these findings by the Bankruptcy Court and therefore, we conclude those findings were not clearly erroneous.

"Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." In re Van Horne, 823 F.2d 1285, 1287 (8th Cir. 1987); see also In re Moen, 238 B.R. at 791. Some of the circumstances to which the Court can look to determine intent include:

1) the length of time between the charges made and the filing of the bankruptcy;

2) whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3) the number of charges made;

4) the amount of the charges;

5) the financial condition of the debtor at the time the charges were made;

6) whether the charges were above the credit limit of the account;

5

7) whether the debtor made multiple charges on the same day;

8) whether or not the debtor was employed;

9) the debtor's prospects for employment;

10) the debtor's financial sophistication;

11) whether there was a sudden change in the debtor's buying habits; and

12) whether the purchases were made for luxuries or necessities.

See Universal Card Servs. v. Pickett (In re Pickett), 234 B.R. 748, 755 (Bankr. W.D. Mo. 1999) (citing Citibank South Dakota N.A. v. Dougherty (In re Dougherty), 84 B.R. 653, 657 (B.A.P. 9th Cir. 1988)).

Universal asserts that the Bankruptcy Court clearly erred in finding lack of intent because the circumstances surrounding Ms. Grause's use of the Universal credit card invokes several of these factors. Universal points primarily to what it refers to as the "flurry of activity" on the account following the large payment in July 1997 as compelling a finding of intent to defraud.

Specifically, Ms. Grause made a payment in the amount of $5,400 by a balance transfer to her MBNA credit card on June 19, 1997, bringing her Universal account balance down to $167.82. The next Universal statement, from July 16 to August 15, 1997, shows multiple charges, sometimes several on a single day. The vast majority of the charges are in amounts of less than a hundred dollars each and were made at places such as Wal Mart, KMart, and Target. In addition to those charges under a hundred dollars, this statement also shows a $538.45 charge to a Creative Expressions in Olathe, Kansas, which Ms. Grause says were for photographs.[3] There is also a $229.43 charge to a lower-end women's clothing store which Ms. Grause said were for "slacks for defendant"; a $147.45 charge to Sears which she says was for auto repairs; and a $158.67 charge to KMart for "household supplies." This statement also shows a $65.38 charge to Comfort Inn in Sioux City, South Dakota, which Ms. Grause described as a vacation for herself and her daughters in that they stayed at a hotel where they could use the pool. Other than this one occasion, Ms. Grause testified she never took vacations and instead used her vacation pay to pay other

---

[3] This charge, for over $500, was very uncharacteristic of the debtor's spending habits as reflected in her various credit card statements and checkbook register.

bills. The statement for this period reflects a total of $1,734.42 in purchases and a $10.00 payment. The balance at the end of this period was $1,913.03.

The following statement, for August 16 through September 15, shows several relatively small purchases for gas and groceries, a couple of charges at Wal Mart, and one at a fast food restaurant. Purchases totaled $472.96 in this cycle and the statement reflects a $40.00 payment.

The next statement, September 16 through October 15, shows multiple charges, sometimes three or four on a single day. Again, all of the charges are small, around a hundred dollars or less, and were all made at grocery stores, gas stations, Wal Mart, and at other lower-end clothing, shoe, and fabric stores. Purchases totaled $670.71 for this period and a $50.00 payment is reflected.

Likewise, the October 16 through November15 statement shows multiple charges, all but two of which were for less than a hundred dollars. Again, nearly all of the charges were at gas stations, grocery stores, Wal Mart, and Target. There is one charge to a fast food restaurant. The two charges that were over a hundred dollars include a charge to Wal Mart for $197.12 and a charge to a grocery store for $143.66. Charges for this period totaled $768.00 and Ms. Grause made a $64.00 payment, which was $80.00 short of the minimum required payment. At this point, her balance on this account was $3,802.74.

The November - December statement shows similar activity: multiple charges at gas stations, grocery stores, and lower-end retailers. Charges totaled $1,071.32 and there is no payment reflected. This statement shows the overdue payment in the amount of $80.00. The account balance at the end of this period was $4,942.89.

The December-January statement contains a message that the account is past due. It also reflects two payments in the amount of $80.00 each and only one charge in the amount of $61.53 to a grocery store.

The next statement, for January - February, indicates that her card was about to expire but that after Universal reviewed her account, she would receive a new one. This statement shows about a dozen charges, all under a hundred dollars, to a grocery store, gas stations, Wal Mart, and a restaurant. Purchases totaled $405.55 and the statement shows two payments totaling $127.00. It shows a current minimum payment due in the amount of $111.00.

7

The next statement bears a message that Ms. Grause had failed to make her minimum payment from the last statement. It shows about a dozen charges, all under a hundred dollars to the same merchants as the others.

The following statement, for March - April, again contains a message that Ms. Grause was past due on a $120 payment, although it shows a payment of $111 having been made. There are two charges to a gas station of $11 each.

The next statement indicates that Ms. Grause is both overlimit and past due on the account and informs her that Universal had sent a negative credit report to a credit reporting agency. The statement reflects no activity on the account other than the addition of fees and finance charges.

The next statement, for May 16 through June 15, indicates that the account has been closed.

Universal asserts that this activity satisfies several of the <u>Dougherty</u> factors. Particularly, as Universal suggests, the record shows Ms. Grause made a significant number of charges to the account; the cumulative amount of the charges is high; Ms. Grause exceeded her credit limit in April 1998; there were sometimes multiple charges on a single day; and Ms. Grause incurred the debt at a time when she was in poor financial condition, which was partly due to her voluntarily refusing to seek child support from her daughters' respective fathers.

On the other hand, although Universal asserts that Ms. Grause was financially sophisticated, the Bankruptcy Court found otherwise and we believe the record supports the Court's finding. Specifically, as the Bankruptcy Court emphasized, Ms. Grause obtained a $22,000 home equity debt-consolidation loan against her house in September 1997 which bore an interest rate of nearly 20%. She used part of the proceeds to pay off some of her credit cards, including her MBNA account, which was the account to which the Universal balance was transferred two months prior. According to the Bankruptcy Court, not only was the interest rate on the home equity loan horrendous, the loan also resulted in Ms. Grause losing all of her home equity exemption which would have been fully exempt in Iowa. She used a portion of the proceeds to pay off her otherwise dischargeable credit card debt. In making his announcement from the Bench, the Bankruptcy Court specifically relied on this poor decision in finding that Ms. Grause lacked financial sophistication. This finding is certainly supported in the record.

Universal further argues that the evidence also indicated the presence of the eleventh factor, a sudden change in buying habits. Specifically, Universal asserts that after she made the large payment on the account, Ms. Grause "essentially made a systematic withdrawal of the credit limit by usage over time." However, although Ms. Grause did systematically use up her credit limit in the several months following the pay-down, there was no evidence at all that this was new behavior or that her spending habits had changed following the pay down. In fact, considering the very significant balances on her various credit card accounts prior to taking the home equity loan, the evidence actually shows that her spending activity following the pay-down was entirely consistent with her habits prior to the pay-down. Moreover, as the Bankruptcy Court pointed out, Ms. Grause had been at or near her credit limit on the Universal card in the months prior to the pay-down, so it was impossible for her to use the card in this manner until after the pay-down.

Universal next asserts that many of the purchases were for luxuries. The Bankruptcy Court recognized that Ms. Grause lived beyond her means and failed to curb her spending in light of her financial condition; nevertheless, there was no evidence that any of the purchases were for luxury items. We believe the record supports this finding as well. As outlined above, the vast majority of the charges on the Universal credit card were made at grocery stores, gas stations, lower-end retailers, and fast food restaurants. Ms. Grause made some of her daughters' clothing and the only vacation they took was to a hotel so they could use the pool. As a result, although she obviously spent more money than she should have on things that arguably were not necessities, the evidence did not mandate a finding that the charges were for luxury items.

We agree that Universal proved the existence of several of the Dougherty factors. Even so, the factors enumerated are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a certain number in order to prove fraudulent intent. See American Express Travel Related Servs. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1997); Household Credit Servs. v. Ettell (In re Ettell), 188 F.3d 1141, 1144 (9th Cir. 1999). Instead, the creditor must show that on balance, the evidence supports a finding of fraudulent intent. Id. We agree with those courts that have said that "factor counting" is inappropriate when applying a subjective standard; rather, the factors are intended to aid a court in determining the debtor's state of mind when she represented her intention to repay. See Rembert v. A T & T Universal Card Servs. (In re Rembert), 141 F.3d 277, 282 (6th Cir. 1998) cert. denied 119 S. Ct. 438, 142 L.Ed. 2d 357 (1998). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This

9

determination will require a review of the circumstances of the case at hand, but not a comparison with circumstances (a/k/a/ 'factors') of other cases." Id. (quoting Chase Manhattan Bank v. Murphy (In re Murphy), 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)).

With these principles in mind, although Universal has established several of the Dougherty factors, and the Bankruptcy Court even found that Ms. Grause lived beyond her means and failed to curb her spending habits in light of her dire financial condition, we cannot conclude that the Bankruptcy Court clearly erred in determining that the overall picture demonstrates she did not intend to defraud Universal. Rather, we believe the Bankruptcy Court's findings comport with the principles enunciated above and are sufficiently supported by the evidence in the record. In essence, the evidence in this case could support a finding either way on the issue of intent, and in such a case, we are not permitted to reverse the decision of the Bankruptcy Court. In re Lemaire, 898 F.2d at 1349 (when there are two permissible views of the evidence, the appellate court may not hold that the choice made by the trier of fact was clearly erroneous). In fact, as long as the bankruptcy court's account of the evidence is plausible in light of the entire record viewed, we must uphold it even if we might have weighed the evidence differently had we been sitting as the trier of fact. See In re Forbes, 215 B.R. at 187. As a result, we cannot say that the Bankruptcy Court's finding regarding intent was clearly erroneous.

Likewise, we believe the record contains sufficient evidence to support the Bankruptcy Court's conclusion that Universal failed to prove justifiable reliance. Essentially, Universal was unable to prove justifiable reliance because, as the Bankruptcy Court specifically noted, "there were red flags all over the place." In other words, Universal not only should have been aware of Ms. Grause's dire financial condition, the evidence shows that Universal was in fact aware of her financial troubles, particularly the activity which Universal asserts evidences Ms. Grause's intent to defraud it.

Universal contends that because Ms. Grause did not inform it of her dire financial condition, its reliance on her promises to pay was justifiable. According to Universal, "Since Defendant was for the most part current in her payments from February of 1997 to March of 1998, Plaintiff had no grounds for concern about Defendant's ability and intent to repay."

To the contrary, the record shows that a cursory look at Ms. Grause's financial situation, both before and after February 1997, should have alerted Universal to her increasingly dire financial condition. Ms. Grause had an annual income of $18,000, on which she supported two children. Even prior to

10

February 1997, Ms. Grause had large balances on several credit cards and her payment history on all of them, including the Universal account, was far less than perfect. In fact, she had fallen far enough behind on the minimum payments on the Universal account in early 1997 that Universal terminated her cash advance privileges at that time.[4]

In addition, the activity which occurred after June 1997, particularly the balance transfer, the high-interest home equity debt-consolidation loan, and the ever increasing balances on her credit cards, should have strongly alerted Ms. Grause's creditors that she was over her head in debt. The July 15, 1997, statement on the Universal account reflects that the $5,400 payment was by electronic payment, and this should have raised a question as to the source of that payment, particularly considering that Universal knew Ms. Grause's annual income was only $18,000. Universal was also obviously aware of the numerous charges being made to the account immediately following the pay-down. Furthermore, after the pay-down, Ms. Grause did not go out and run up the balance in a short period of time or before Universal could take action. Rather, the allegedly fraudulent conduct (i.e., numerous charges, maintaining a high balance, and so forth) continued rather steadily for over eight months following the pay-down. As outlined above, Ms. Grause used her card with relative consistency, making multiple charges and making only minimal payments until she went over her credit limit during the billing cycle ending May 15, 1998, ten months after the pay-down. Although it was obviously aware of this activity, Universal apparently did nothing to investigate the situation except to periodically check her FICO scores, which, according to Universal, never dipped below the 620 acceptable score, despite all of this financial trouble.

Moreover, as early as November 1997, Ms. Grause was again falling behind on even the minimum required payments on the Universal account. In addition, she had been over the credit limit on her Discover account since January 1997; her Providian credit card account went over limit during the November 1997 billing cycle, and except for one cycle in 1998, remained over-limit until the bankruptcy filing; and finally,

---

[4]  Universal points to this fact to support its argument that it monitored Ms. Grause's creditworthiness and that it took action to curtail her spending, thereby requiring a finding that its reliance was justifiable. While this argument is not without merit, the fact that Universal terminated her cash advance privilege because of her poor payment history is a double-edged sword: it proves Universal was aware of Ms. Grause's credit problems as early as February 1997, and the only action it took was to terminate one form of her ability use of the card. It did not reduce her credit limit or take any other additional action. Furthermore, in light of these problems with her account, Universal should have been particularly interested in the "flurry of activity" after the pay down in July 1997.

she went over her credit limit on her MBNA account in January 1998, despite having been paid off in September 1997 with the home equity loan proceeds. In other words, Ms. Grause was already over the limit on all of her credit card accounts, except for the Universal account, by January 1998. Yet Universal either did nothing to monitor this or decided not to take any action in response until she exceeded the limit on its account several months later. In fact, Universal issued a new card to Ms. Grause in February 1998 because her old card was expiring. Apparently, in making the decision to renew the account, all Universal did was obtain Ms. Grause's FICO score, which amazingly never showed any problems until about the time she filed her bankruptcy petition.

In sum, Ms Grause engaged in several years of spending habits that were plainly steering her into financial trouble and a cursory examination of the situation, as early as January 1997, and definitely by late 1997, should have put her creditors, including Universal, on notice of the problem.

## Conclusion

We conclude that the record contains sufficient evidence to support the Bankruptcy Court's findings that Universal failed to prove Ms. Grause intended to defraud it and that Universal failed to prove it justifiably relied upon representations made by her. These findings are particularly fact-based and depend heavily upon credibility determinations, which the Bankruptcy Court specifically made. Because the Court's findings are supported by the record, we conclude that the decision of the Bankruptcy Court is not clearly erroneous. The Bankruptcy Court's judgment, therefore, is affirmed.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
EIGHTH CIRCUIT

12