# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 13-6061

_____

In re: Robert L. Fields, As surety for 1st Ave Commons Condo Assoc., As surety for ABP, LLC, As surety for Bella Sera Maple Grove, Inc., As surety for Brunswick Otsego, LLC, As surety for BT South, LLC, As surety for BT West, LLC, As surety for D.R.R.T., LLC, As surety for Daycare RE, LLC, As surety for Euro Group, LLC, As surety for Waterfront East, LLC, As surety for KPR Investments, LLC, As surety for Land Funding I, LLC, As surety for LandCor Companies, Inc., As surety for LandCor Capital, LLC, As surety for LandCor, Inc., As surety for Lexington Plaza Blaine, LLC, As surety for Main Street Otsego, LLC, As surety for Maple Grove Ocean Club, inc., As surety for MVO&R, LLC, As surety for River Plaza, LLC, As surety for Riverview Plaza, LLC, As surety for Wind and Renewable Energy Solutions, As surety for Xerxes Commerce Center Assoc., As surety for Xerxes Commercenter, LLC, As surety for Otsego Hospitality, LLC, As surety for Otsego Embers America, LLC, As surety for PASF, LLC; Patricia A. Fields, also known as Patricia S. Fields

*Debtor*s

-------------------------------

Community Finance Group, Inc.

*Plaintiff - Appellee*

v.

Robert L. Fields

*Defendant - Appellant*

_____

Appeal from United States Bankruptcy Court
for the District of Minnesota - Duluth
_____

Submitted: March 26, 2014
Filed: May 15, 2014
_____

Before FEDERMAN, Chief Judge, SCHERMER and NAIL, Bankruptcy Judges.
_____

SCHERMER, Bankruptcy Judge

Robert L. Fields (the "Debtor") appeals from the judgment of the bankruptcy court[1] excepting a debt owed to Community Finance Group, Inc. ("CFG") from the Debtor's discharge under 11 U.S.C. § 523(a)(2)(A). We have jurisdiction over this appeal from the final order of the bankruptcy court. *See* 28 U.S.C. § 158(b). We affirm.

**ISSUES**

The issues in this appeal are whether the bankruptcy court clearly erred when it found that: (1) the Debtor made a misrepresentation to CFG regarding how the proceeds of the loan would be used; and (2) CFG justifiably relied on the misrepresentation. We also examine whether the bankruptcy court appropriately determined that the Debtor's misrepresentation was made with the requisite knowledge and intent to deceive. We see no clear error in the bankruptcy court's decision.

_____

[1] The Honorable Gregory F. Kishel, Chief Judge, United States Bankruptcy Court for the District of Minnesota.

2

## BACKGROUND

On February 15, 2010, the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). At that time, Main Street Otsego, LLC ("MSO"), a company formed by the Debtor to pursue a commercial real estate project, was in default on its loan obligations to CFG. The dispute in this case arises from that default.

The Debtor was the Chief Executive Officer and Chief Manager of MSO. He had considerable experience in the construction and real estate industries, as he was involved in the development of real estate and construction of buildings for a significant period of time, and owned and operated numerous entities involved in those businesses. The Debtor formed LandCor Construction, Inc. ("LCCI") and LandCor, Inc. ("LandCor") to handle construction and property management.

The bankruptcy court found that throughout his many years in the commercial real estate industry, the Debtor had worked with lenders to obtain loans, and he was familiar with the requirements of lenders. The Debtor knew that a material consideration for lenders was the borrower's intended use for the funds. He also knew that lenders expected, and relied upon, a potential borrower's representations being accurate and complete. In the past, the Debtor acted as an investor in and board member of a bank. In that capacity, he reviewed applications for credit.

MSO held two buildings on a parcel of property that was part of the Debtor's larger development of a multi-parcel real estate project, commenced before 2005, and known casually as 'the Waterfront development" or "Main Street Otsego." Each parcel for the project was owned by a separate entity and had its own financing.

3

GCI Capital, Inc. ("GCI") provided the initial financing for MSO's project, through the grant of a $7,500,000 line of credit.[2] Although MSO was permitted to draw on the line of credit as needed, GCI had the power to suspend MSO's right to make draws. The line of credit was secured by a first mortgage on the property. In addition, the Debtor personally guaranteed MSO's obligations to GCI.

By April, 2008, a time when MSO had drawn approximately $5,800,000 on the line of credit, MSO experienced difficulty satisfying its obligation to pay interest to GCI, and GCI froze MSO's ability to make draws. In April, 2008, GCI and MSO entered into a forbearance agreement. Part of the forbearance agreement required MSO to pay remaining accrued interest when the full principal amount of the note came due four months later, on August 15, 2008, under the original terms of the loan.

Notwithstanding the Debtor's persistent requests for GCI to renegotiate the terms of the loan, to allow MSO to make an additional draw on the line of credit, and to change the arrangement into a "permanent loan with a long-term amortization," GCI was not willing to do so. GCI would not discuss the situation with MSO absent a full cure of MSO's interest arrearages. And, as the bankruptcy court stated, "[m]ore crucially, [GCI] would promise to discuss no more than an extension of the due date for a fixed period of a few months beyond that reset under the forbearance."

During the summer and early fall of 2008, MSO had difficulty securing tenants for its property. It had two or three signed leases, and none of the other possibilities for tenants moved toward a signed lease that summer.

---

[2] The bankruptcy court found that "[a]fter originating the credit to MSO, GCI [ ] sold it out on participation to a group of small banking institutions. GCI [ ] continued to service the account."

Aside from revenue from the two or three leases, MSO had little or no other capital during the summer and early fall of 2008. The prospects for accommodation to MSO from GCI did not improve during that time. And, on October 6, 2008, GCI issued a notice of default and demand for payment from MSO of the full debt. In the meantime, the Debtor was experiencing similar problems satisfying the obligations for several of his other real estate entities. In September, 2008, the Debtor was desperate.

Andrew Vilenchik was CFG's General Manager. Vilenchik described CFG at trial as "'mainly a residential mortgage originator,' that also 'conducted some commercial transactions.'" The parties stipulated that CFG "is a Minnesota finance company that provides a wide range of real estate based financial services to residential and commercial clients with all types of income and credit backgrounds."

In mid-October, 2008, the Debtor and Vilenchik first met. After their first encounter, the two met later in October, 2008 to discuss the possibility of CFG providing commercial financing for the Debtor's projects. The bankruptcy court found that the Debtor told Vilenchik that his personal funds had been frozen due to an investigation by the FDIC of a bank in which the Debtor was an owner and principal. After describing CFG's lending guidelines and the circumstances under which CFG would provide a loan, Vilenchik indicated the Debtor could submit a loan application. Three days later, the Debtor and Vilenchik met again, at which time the Debtor submitted to Vilenchik what he called a "bank book," a compilation of documents including information he submitted to support MSO's request for a loan. The bank book included various documents such as a "rent roll" for MSO's properties. In response to Vilenchik's inquiry as to why the bank book included financial documents for LCCI and LandCor, but not for MSO, the Debtor stated the LCCI and LandCor financials were relevant since MSO was "just a shell company." The Debtor did not submit a written loan application to CFG.

5

Prior to a meeting between the Debtor and Vilenchik four days later, Vilenchik had a real estate service company that he owned conduct a search of the public records with respect to the MSO property. The GCI mortgage was the only lien or encumbrance that appeared of record, but outstanding real estate taxes owed by MSO were noted. Vilenchik performed an external inspection of the MSO properties and determined that the properties were "well-managed." During the site visit, the Debtor told Vilenchik that GCI froze MSO's line of credit.

A third-party, Duane Kropuenske, accompanied the Debtor and Vilenchik on the site visit. Kropuenske testified that he attended the site visit "as a friend to ride along with [the Debtor]." At the time, Kropuenske worked with the Debtor on a commission basis. In the past, Kropuenske had been the president of a bank for which the Debtor was an investor and a fellow board member.

CFG agreed to loan MSO funds and, on November 6, 2008, the closing took place for a single disbursement of a $500,000 loan to MSO, even though Vilenchik had originally proposed that the loan be structured as a construction loan. The loan was meant to be short-term; its maturity date was 60 days from closing. Although CFG did not normally lend on the strength of a second mortgage, it did so this time.

One of the documents presented as an exhibit at trial from the CFG loan closing, which has received attention in this appeal, but was not discussed in the bankruptcy court's opinion, is a *Written Action of the Governor of Main Street Otsego, LLC* (the "Written Action of Governor"). This document was signed by the Debtor as Governor of MSO, and it states that MSO entered into the loan transaction with CFG "pursuant to which [MSO] will borrow from [CFG] the amount of $500,000.00 to help refinance the Property."

Of the $500,000.00 in loan proceeds, the net amount disbursed to MSO was only $393,810.27. The balance of the loan proceeds were used to pay outstanding

6

real estate taxes, and the rest were used for a loan origination fee, plus other fees and charges. Shortly after disbursement of loan proceeds, MSO paid approximately $335,000.00 to GCI, which cured MSO's interest arrearage default to GCI, and allowed MSO to secure a 90 day extension of the due date of its GCI loan to March 1, 2009. None of the loan proceeds were used for tenant improvements.

The bankruptcy court characterized Vilenchik as less experienced than the Debtor in the type of lending requested for the MSO project. The court noted that Vilenchik's testimony about his experience with commercial leasing and finance was "tersely and broadly" phrased. Although, as the bankruptcy court noted, Vilenchik had conducted evaluations for sizeable loans, had overseen tenant improvements for commercial projects, and was the "decision maker for a privately-capitalized residential and commercial lender for several years," Vilenchik did not provide detailed testimony regarding his experience reviewing applications for commercial loans of the type and for the purposes requested by MSO. The bankruptcy court found that Vilenchik "did not testify to the length, breadth, frequency, or magnitude of his experience in the commercial sector, for [CFG] or otherwise."

Ultimately, MSO defaulted on its obligations to both CFG and GCI. GCI foreclosed on its mortgage and took ownership of the property. CFG did not participate in the foreclosure as a junior lender.

After the Debtor's bankruptcy filing, CFG commenced an adversary proceeding, seeking both a money judgment and asserting that the debt was nondischargeable under Bankruptcy Code §§ 523(a)(2)(A) and (B). During the course of the adversary proceeding, the Debtor was granted summary judgment on certain theories advanced by CFG regarding why the Debtor should be held personally liable for MSO's debt. The bankruptcy court reserved for trial the issue of whether the Debtor was personally liable based on his commission of common law fraud in inducing CFG to lend to MSO. The bankruptcy court held the Debtor liable

for the debt of MSO in a sum certain, and excepted such debt from the Debtor's discharge pursuant to Bankruptcy Code § 523(a)(2)(A). This appeal concerns only the issue of dischargeability under § 523(a)(2)(A).[3]

## STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*. *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 609 (8th Cir. 1997); *Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999). Whether the elements of a claim under § 523(a)(2)(A) have been shown is a factual determination that is reviewed for clear error. *R & R Ready Mix v. Freier (In re Freier)*, 604 F.3d 583, 587 (8th Cir. 2010) (*citing Pontow*, 111 F.3d at 609). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (*quoting U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). We give due regard to the bankruptcy court's opportunity to judge the credibility of witnesses. FED.R.BANKR.P. 8013.

## DISCUSSION

**A.      11 U.S.C. § 523(a)(2)(A)**

Exceptions to discharge are usually "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987), *abrogated on other grounds*, *Grogan v. Garner*, 498 U.S. 279 (1991). "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording

---

[3]      The bankruptcy court based its decision on a single representation by the Debtor. CFG did not file a cross appeal from the bankruptcy court's rejection of other alleged misrepresentations by the Debtor as bases for a ruling under § 523(a)(2)(A).

8

relief only to an 'honest but unfortunate debtor.*" Cohen v. de la Cruz,* 523 U.S. 213, 217 (1998) (internal citation omitted).

Bankruptcy Code § 523(a)(2)(A) excepts from a debtor's discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . a false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A). A ruling that a debt is non-dischargeable under § 523(a)(2)(A) requires proof, by a preponderance of the evidence, that:

1. The debtor made a representation.

2. The debtor knew the representation was false at the time it was made.

3. The representation was deliberately made for the purpose of deceiving the creditor.

4. The creditor justifiably relied on the representation.

5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

*Freier,* 604 F.3d at 587 (citing *Burt v. Maurer (In re Mauer)*, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000), and *In re Ophaug*, 827 F.2d 340, 343 (8th Cir. 1987), *as modified by Field v. Mans*, 516 U.S. 59, 74-75 (1995) (requiring justifiable reliance)).

## B.    Misrepresentation

The bankruptcy court focused on one misrepresentation by the Debtor: "the nature of MSO's need for a loan from [CFG] and the uses to which the [Debtor] would put the proceeds to satisfy that need."

Viewing the evidence in light of the surrounding circumstances, the court found that the Debtor told Vilenchik he needed the funds to complete tenant

improvements at MSO's property to get prospective tenants to commit to occupy the property. Contrary to the Debtor's version, the bankruptcy court found the Debtor only hoped that GCI would extend additional credit to MSO if MSO could secure the occupancy of additional tenants. The court did not accept the Debtor's claim that he told Vilenchik the purpose of the loan was to pay past-due interest to GCI so MSO could "get an extension" on the debt to GCI. The bankruptcy court found that Vilenchik testified he would not have had CFG make the loan to MSO if the representation to him had been the one the Debtor claims to have made. We see no clear error with the bankruptcy court's finding.

The bankruptcy court specifically said it found the existence of a misrepresentation by the Debtor based on its assessment of the credibility of the witnesses in light of the surrounding circumstances, and that it found the content of Vilenchik's testimony to be the most credible. We will not second guess the bankruptcy court's assessment of credibility. *See* FED.R.BANKR.P. 8013. The court provided a thorough explanation of how it arrived at its decision regarding credibility, and the court's decision is supported by the record.

The bankruptcy court found that CFG would not have made the loan, as the Debtor claims CFG did, to repay past due interest owed to GCI, a senior lender, simply on the Debtor's assurance that the Debtor would try to *work with* GCI for additional funds under the senior loan. The Debtor claimed that he told Vilenchik that, earlier in 2008, he had threatened to file a bankruptcy petition on behalf of MSO. It was not credible to the bankruptcy court that CFG would make such a loan after the Debtor made such a disclosure regarding how it was willing to treat GCI. According to the bankruptcy court "[g]oing ahead as [Vilenchik] did is not rationally consistent with receiving a statement like the [Debtor] says he made." We see no error with this analysis.

The bankruptcy court also supported its decision with a finding that it was more likely that the Debtor, given his level of experience, and in a dire position, would not have disclosed to a potential lender that it had threatened filing a bankruptcy case. The Debtor would have known that such a disclosure would not have helped MSO obtain a loan it so desperately needed.

Moreover, even if the Debtor made the representation he claims to have made (that the funds were for payment of interest arrearage to GCI), the evidence did not show the Debtor had an understanding with GCI that if MSO paid the outstanding interest owed he could likely renegotiate with GCI and obtain funding so MSO could repay CFG's loan.

The Debtor advanced various arguments before us regarding why he believes the bankruptcy court's decision was made in clear error. The Debtor has not convinced us.

According to the Debtor, the bankruptcy court should not have disregarded testimony of Kropuenske because the facts as presented by Vilenchik could not have been true based on Kropuenske's testimony. The Debtor complains the bankruptcy court improperly stated that Kropuenske testified that Vilenchik was present when the Debtor *told Kropuenske* the purpose for the loan was to pay unpaid interest, but Kropuenske had actually testified that Kropuenske heard the Debtor *tell Vilenchik* that he needed the loan for that purpose. Regardless of whether Kropuenske in fact testified about hearing the Debtor tell Vilenchik the purpose for the loan, the bankruptcy court noted that Kropuenske "repeatedly qualified what he was saying was 'to the best of [his] recollection.'" The bankruptcy court reasonably decided that Kropuenske's testimony should be afforded no weight. And the bankruptcy court reasonably determined that Kropuenske's testimony could not corroborate that of the Debtor in light of his involvements with the Debtor. The bankruptcy court was in the best position to judge the credibility of Kropuenske's testimony.

11

The Debtor also maintains the evidence does not support the finding that the Debtor told Vilenchik the loan was needed for tenant improvements. The Debtor posits it was illogical that Vilenchik would have the impression that the loan was for tenant improvements since the Debtor supposedly told Vilenchik MSO needed $500,000 for tenant improvements, but the final loan disbursement was significantly less than that amount after payment of outstanding real estate taxes, fees and costs. The bankruptcy court's finding is not clearly erroneous.

Next, the Debtor points to the Written Action of Governor of MSO as support for his argument that the Debtor could not have told Vilenchik that the funds were for tenant improvements because the Written Action of Governor states that MSO borrowed the funds from CFG "to help refinance the [p]roperty." We disagree with the Debtor. Vilenchik understood MSO needed the tenant improvements to advance a further goal of obtaining more money. The mention of refinancing the property in the Written Action of Governor proves nothing.

The balance of the Debtor's arguments regarding why the bankruptcy court was wrong to find the misrepresentation by the Debtor are unpersuasive. The Debtor argues that the statements the bankruptcy court found to be made by the Debtor are not actionable because they relate to future conduct or constitute an oral statement regarding the financial condition of the Debtor or MSO.

The controversial statement, however, was that MSO needed the loan for tenant improvements, and would use the funds for that purpose. The bankruptcy court did not clearly err by treating the misrepresentation as actionable. The statement is either one regarding a present fact (the need and present intent regarding use of funds), or a statement by the Debtor regarding his intended use of the funds in the future when, accepting the findings of the bankruptcy court, the Debtor never intended to use the loan proceeds to make tenant improvements. *Freier*, 604 F.3d at 588 ("A material

12

promise to perform in the future 'made with the intent to defraud and without the intent to perform. . . .constitutes actionable fraud.'") (quoting *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1379 (8th Cir. 1983)).

The Debtor claims the representation concerns how CFG would be repaid in the future, maintaining that this is not actionable because it is a future promise to perform, or a statement of opinion or prediction, and not a statement of past or present fact. Contrary to the Debtor's argument, the misrepresentation found by the bankruptcy court to be the basis for the fraud was not that GCI would release funds in the future. Rather, the representation was that the funds borrowed from CFG were needed for, and the Debtor's intent was to use them for, tenant improvements. The Debtor merely hoped that there would be additional financing from GCI down the road if MSO was successful in its effort to make tenant improvements and sign more lessees.

The Debtor claims the representation was an oral statement "respecting the [D]ebtor's or an insider's financial condition," that is excepted from the purview of § 523(a)(2)(A). 11 U.S.C. § 523(a)(2)(A). As support for his argument, the Debtor cites to the bankruptcy court's statement that the representation "went to both post and contemporaneous fact, the specific financial stresses on the MSO development that required near-term remediation if the project was to stay whole under MSO and a prospective short-term lender were to be repaid by MSO in its own right." Read in the context of the bankruptcy court's opinion, we do not see how this quote demonstrates that the representation regarding the need for, and the intended use of, the loan proceeds for tenant improvements concerned the Debtor's, or an insider of the Debtor's, financial condition.

## C.  Knowledge and intent

We will not second guess the bankruptcy court's finding that the Debtor knew the representation was false. We see nothing in the record to suggest otherwise.

13

We see no error with the bankruptcy court's decision that the intent requirement was met. A creditor may introduce circumstantial evidence to infer a fraudulent intent. *Universal Bank, N.A. v. Grause (In re Grause),* 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000). The court determined that, given the Debtor's experience, he knew what lenders needed to evaluate a request for financing, and that the intended use for the funds was a material consideration. Therefore, the court found the Debtor knew he needed to report to CFG a plan for the use of the funds that would show a supportable means of repaying CFG. The court assessed that the Debtor understood Vilenchik was less experienced in the relevant type of transaction and, therefore, made the misrepresentation to Vilenchik as part of a "fully-structured story" about the need for the loan, the use of the funds, and what would happen as a result, with the intent that Vilenchik would rely on the Debtor's misrepresentation and cause CFG to extend the loan to MSO.

### D. Justifiable reliance

"Justifiable reliance is an intermediate standard between actual reliance and reasonable reliance." *Freier*, 604 F.3d at 588 (citing *Field*, 516 U.S. at 70-73). A determination of justifiable reliance depends on the creditor and the facts of the particular case. *Islamov v. Ungar (In re Ungar*), 633 F.3d 675, 679 (8th Cir. 2011) (citing *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts (1976) § 545A, Cmt. b)). Reliance may be justifiable even when an investigation would have revealed the representation's falsity. *Freier,* 604 F.3d at 588 (citing *Field*, 516 U.S. at 74-75). Reliance is not justified when a creditor "blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (citing *Field*, 516 U.S. at 71) (quoting Restatement (Second) of Torts (1976) § 541, Cmt. a)).

The bankruptcy court's finding of justifiable reliance was made in the context of a whole proposal for a specific business strategy that the Debtor made to CFG (through Vilenchik), which the court reasonably determined to make sense as long

as Vilenchik accepted the representation made by the Debtor. The Debtor painted a picture whereby CFG would provide funding to MSO, to hopefully allow the loosening of other credit to MSO, and CFG would be able to exit quickly. As represented, the funds were needed for, and would be used for, tenant improvements, which would, if everything went according to plan, allow this all to happen.

We see no error with the bankruptcy court's determination that Vilenchik (and thus CFG) justifiably relied on the Debtor's misrepresentation. We disagree with the Debtor's allegation that CFG relied on the financial condition of MSO, rather than on the misrepresentation found by the bankruptcy court. The court appropriately found that CFG looked to asset strength only as a second resort and that, in deciding to give the loan to MSO, CFG's primary reliance was on the representation made by the Debtor which supported the Debtor's whole proposal. The court noted that the arrangement for the extension and repayment of the loan made facial sense provided CFG accepted the Debtor's misrepresentation.

Contrary to the arguments by the Debtor, we see no error in the bankruptcy court's determination that CFG performed sufficient due diligence prior to extending the loan to MSO. Vilenchik did background work, such as credit checks for the Debtor and his wife and obtaining a title report for the property, before CFG extended the loan. From that, Vilenchik concluded the personal credit of the Debtor and his wife was good, and he did not find defaults on the GCI loan or other liens of record. In addition, Vilenchik did an exterior inspection of the property and decided that it was well-managed.

The bankruptcy court noted the Debtor argued Vilenchik should have taken additional measures. As that court recognized, although Vilenchik could have done and required more before CFG made the loan, his failure to do so under the circumstances of this case does not defeat the justifiability of his reliance. We see no error in the bankruptcy court's determination that Vilenchik took sufficient steps.

15

The Debtor sets forth a litany of qualifications for Vilenchik that the Debtor believes prove the reliance was not justifiable; for example, Vilenchik has a college degree and has his own title company. None of Vilenchik's qualifications as listed by the Debtor or shown through the record defeat the justifiability of Vilenchik's (thus CFG's) reliance. The record supports the bankruptcy court's finding that Vilenchik's review of MSO's request for credit was consistent with his level of experience in the area. It appropriately found that, based on the record, the Debtor was more sophisticated in terms of obtaining this type of financing than Vilenchik was at determining whether to extend it. It was not error for the court to find that "there is no doubt that the [Debtor] parlayed his greater experience against Vilenchik's lesser, through a short process of vetting, and got pretty much what he wanted."

The Debtor demonstrated the existence of no "red flags" that would show that the bankruptcy court erred by finding justifiable reliance. The record supported the bankruptcy court's statement that Vilenchik's diligence did not disprove the scenario the Debtor had presented. And the bankruptcy court appropriately found "[t]here was nothing in the representation's content; nothing in the [Debtor's] other submissions to [CFG]; nothing from the pro forma, standard credit investigation that Vilenchik performed; and nothing from Vilenchik's experience with the [Debtor] in the very brief relationship that they had had, that raised any question about the truth of what the [Debtor] said."

The bankruptcy court noted things that the Debtor had alleged and proposed to be "red flags" to Vilenchik: "all of the [Debtor's] businesses were closely-held, somehow casting doubt on their stated values . . . ; any conclusions of substantial future income from the [Debtor's] full enterprise had to be considered bogus . . . ; and the [Debtor] had large problems with taxing authorities evidenced by the returns submitted. . . ." We see no error in the court's determination that Vilenchik's (and thus CFG's) justifiable reliance was not defeated.

16

The Debtor refers to the Written Action of Governor and its statement that MSO would borrow $500,000 from CFG "to help refinance the [p]roperty," as an indication that the representation was false. We disagree. As explained in our discussion of the Debtor's misrepresentation, Vilenchik was aware that the purpose of obtaining the money to make tenant improvements was part of a larger effort to obtain additional funding. Likewise, as we also stated in our discussion of the Debtor's misrepresentation, the fact that MSO would only receive a portion of the loan proceeds after payment of outstanding property taxes, fees and costs proves nothing. The statement in the Written Action of Governor was not a red flag.

Additional red flags suggested by the Debtor, for example, that the Debtor begged that the loan not be structured as a construction loan, that the GCI loan and unpaid real estate taxes showed up on CFG's title search, or that failure to pay real estate taxes and the expiration of the maturity date of the mortgage would have been defaults under the terms of that document and apparent from the face of the document, are not red flags at all. Nothing argued by the Debtor would have required the bankruptcy court to find that a lender like CFG, under the circumstances present in this case, should have known the Debtor lacked the intent to use the funds for the stated purpose of tenant improvements.

## E.    Damages

The Debtor makes no argument on appeal regarding whether CFG sustained loss as a proximate result of the Debtor's representation, and we do not second guess the bankruptcy court's determination that this element of § 523(a)(2)(A) was met.

## CONCLUSION

For the reasons stated, we affirm the decision of the bankruptcy court.

-----------------

17