# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1916

_____

In re:  Todd Dewaine Freier,              *
                                          *
            Debtor.                       *
_____                        *   Appeal from the United States
                                          *   Bankruptcy Appellate Panel
R&R Ready Mix,                            *   for the Eighth Circuit.
                                          *
            Appellant,                    *
                                          *
      v.                                  *
                                          *
Todd Dewaine Freier,                      *
                                          *
            Appellee.                     *

_____

Submitted: February 10, 2010
Filed:  May 10, 2010

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

      R&R Ready Mix, Inc. ("R&R") brought this adversary action against debtor
Todd Dewaine Freier to obtain a determination that Freier is personally liable for a
state-court money judgment rendered in favor of R&R and against T.F. Concrete, Inc.

("T.F."), a corporation wholly owned by Freier. The bankruptcy court[1] pierced T.F.'s corporate veil and held that Freier's debt to R&R was a non-dischargeable debt under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(4). The Bankruptcy Appellate Panel ("BAP") reversed, holding that the bankruptcy court's findings with regard to the non-dischargeability of Freier's debt were clearly erroneous. Exercising jurisdiction pursuant to 28 U.S.C. § 158(d), we reverse the judgment of the BAP.

I.

Freier was the sole shareholder, officer, and director of T.F., a Minnesota corporation. T.F. was a contracting company that performed concrete work, masonry, and construction of residential building foundations. Freier was the only T.F. employee, and he operated the business on a part-time basis. He prepared all bids for work performed by T.F., and his bids regularly included the cost of materials and a 100 percent mark-up for his labor and profit. T.F. collected nearly all of its payments due and had no accounts receivable.

R&R supplied T.F. with concrete and related services on a credit basis in exchange for T.F.'s promise to pay for all materials and services provided by R&R. Despite receiving payment from its customers, T.F. failed to pay R&R for a substantial amount of materials and services. By November 2004, T.F. owed R&R approximately $160,000. R&R notified Freier that it would stop extending credit to T.F. and would pursue collection on T.F.'s account. Freier responded that T.F. would declare bankruptcy if R&R would not allow T.F. to purchase on credit. In late December 2004, Freier promised R&R's president, David Luedeke, that T.F. would pay the outstanding debt. R&R agreed to a reduced payment schedule for the winter months. Nonetheless, T.F. immediately failed to make a payment.

---

[1]The Honorable Dennis D. O'Brien, United States Bankruptcy Judge for the District of Minnesota.

In February 2005, R&R commenced legal action against T.F. in state court seeking judgment for the unpaid materials and services. Freier contacted Luedeke to resolve the legal action and outstanding debt and to ask R&R to continue supplying materials to T.F. on credit. As part of the ensuing settlement negotiations, Freier said that he had the financial ability to pay $500 per month for February and March and $5000 or $6000 for the months thereafter. Freier also provided R&R with a "Corporate Financial Statement" for T.F. It is undisputed that the Corporate Financial Statement was inaccurate, as it did not include the debt owed to R&R and at least $20,000 in debts T.F. owed to other creditors.

Also during the discussions in December 2004 and February/March 2005, according to R&R, Freier stated that he was not taking any funds from T.F.'s accounts for himself personally. Freier assured Luebeke that he was putting the company first and paying off T.F.'s debts before paying himself. Freier does not recall making such representations.

R&R and T.F. executed a settlement agreement on March 31, 2005. They acknowledged that T.F. owed $159,961.07 with interest and finance charges accruing from and after January 31, 2005. The settlement agreement obligated T.F. to pay $1,000 upon execution and established a monthly payment schedule from April 2005 through December 2006. If T.F. failed to make the required payments, R&R was entitled to default judgment. In exchange, R&R abandoned its collection efforts and agreed to continue supplying materials to T.F. on an ongoing credit basis provided T.F. was not in default under the terms of the settlement agreement.

In 2005, T.F. paid R&R $25,500, which included $9,078.10 toward debt reduction and $16,421.90 toward new purchases. However, in August 2005, T.F. failed to make a monthly payment of $7,000 as per the settlement agreement. R&R sent T.F. a notice of default, which identified T.F.'s failure to make the monthly payment and also identified T.F.'s failure to pay $30,135.27 for materials supplied

during summer 2005. Thus, less than five months after signing the settlement agreement, T.F. defaulted and increased its overall debt owed to R&R.

Contrary to his alleged representation to Luedeke, Freier admitted at trial that he used corporate assets for his personal benefit throughout 2005. In January 2005, one week after representing he was taking no money from the corporation, Freier purchased a Yamaha snowmobile by charging $3,774.94 to T.F.'s credit card accounts. Freier also used corporate money to pay for a portion of the cost of constructing a large detached garage/building at his residential property. Between March 31, 2005 and September 16, 2005, Freier paid himself $27,250 cash from T.F.'s accounts. He also used corporate assets to pay personal expenditures such as his personal credit card, personal phone, cell phone plans for his family, personal travel expenses, personal dining, insurance premiums for personal assets, and other in-kind income that totaled several thousand dollars. On September 20, 2005, Freier caused T.F. to purchase a new 2006 Chevrolet Pickup for $40,000, even though T.F. already owned a 2004 Chevrolet Pickup and Freier was the sole employee of T.F. Freier used the 2006 pickup for personal use even though T.F. paid for all of the financing payments, insurance, gas, and maintenance for the vehicle. In total, Freier withdrew at least $70,000 from T.F. for his personal use in 2005.

Default judgment was entered against T.F. on September 8, 2005, in the amount of $150,882.97. R&R was unsuccessful in collecting the judgment through garnishment and renegotiation of the debt, despite the fact that Freier deposited $228,605 into T.F.'s checking accounts in 2006. In July 2006, Freier shut down operation of T.F. because no one was willing to supply T.F. materials on credit and because T.F. could not pay for materials in advance. He formed a new corporation under the name Concrete Productions, Inc. Freier was also the sole owner, officer, and employee of the new corporation, which performed the exact same work and services as T.F. Freier did not contribute any consideration or capital to Concrete Productions, but he conducted business using all of the tools, machinery, equipment,

-4-

and assets belonging to T.F. without payment or consideration to T.F. Freier opened separate bank accounts in the name of Concrete Productions, and he deposited all income from the concrete construction business after approximately September 15, 2006, into the Concrete Productions accounts.

R&R ultimately sued T.F., Freier, and Concrete Productions in state court requesting that the court pierce the corporate veils of T.F. and Concrete Productions. R&R alleged both companies were Freier's alter egos and T.F. was a facade through which Freier obtained personal benefits. Freier then filed for bankruptcy relief under Chapter 7.

R&R filed a complaint in the bankruptcy court requesting a judgment of non-dischargeability as to Freier's debt to R&R in the amount of $150,882.97. On August 25, 2008, after a trial on the merits, the bankruptcy court held that piercing T.F.'s corporate veil was appropriate because Freier operated T.F. in a fraudulent manner, and therefore T.F.'s debt to R&R was also the personal debt of Freier. Further, the bankruptcy court held the debt owed to R&R non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) (false representation or actual fraud), 523(a)(2)(B) (materially false financial statement), and 523(a)(4) (fraud while acting in a fiduciary capacity). Accordingly, the court ordered that the debt was not discharged in Freier's bankruptcy, but remains his personal liability, subject to collection pursuant to state law.

On March 20, 2009, the BAP reversed. It held that the bankruptcy court's factual findings under the subsections of § 523(a)(2) were clearly erroneous and that the bankruptcy court erred as a matter of law in finding a fiduciary relationship between R&R and Freier/T.F. under § 523(a)(4) . R&R appealed the BAP's decision.

II.

We apply the same standard of review as the BAP regarding R&R's claim under 11 U.S.C. § 523(a)(2)(A).  In re Vote, 276 F.3d 1024, 1026 (8th Cir. 2002).  Whether a requisite element of a claim under § 523(a)(2)(A) has been satisfied is a factual determination, which we review for clear error.  See First Nat'l Bank v. Pontow, 111 F.3d 604, 609 (8th Cir. 1997).  A finding is clearly erroneous if, after reviewing the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed."  Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (quotation omitted).

"Section 523(a)(2)(A) of the Bankruptcy Code prevents persons from committing actual fraud and then wiping away their resulting debt."  In re Miller, 276 F.3d 424, 429 (8th Cir. 2002).  To obtain a determination that debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

1. The debtor made a representation.
2. The debtor knew the representation was false at the time it was made.
3. The representation was deliberately made for the purpose of deceiving the creditor.
4. The creditor justifiably relied on the representation.
5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

Burt v. Maurer (In re Mauer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000); see also In re Ophaug, 827 F.2d 340, 343 (8th Cir. 1987), as modified by Field v. Mans, 516 U.S. 59, 74–75 (1995) (requiring justifiable reliance).

Having heard testimony from Freier and Luedeke, the bankruptcy court concluded that Freier's assurance to R&R during negotiations "that he was taking no

draws from T.F. Concrete was an intentional misrepresentation of a material fact made to induce [R&R] to forebear collection efforts and to continue to supply [Freier] with concrete product and services on credit." In re Freier, 392 B.R. 779, 786 (Bankr. D. Minn. 2008).  Freier challenges the bankruptcy court's holding in several ways.

First, Freier argues that his statements did not constitute actionable fraud because they did not relate to a matter of present or past fact.  We disagree.  Based on the trial testimony, the district court found that Freier misrepresented a present fact—"Freier represented to Luedeke that he *wasn't* taking any funds from T.F. Concrete for himself personally, reassuring the plaintiff that he *was* doing everything he could to pay the outstanding debt."  Id. at 783 (emphasis added).  It was not clear error for the bankruptcy court to interpret the trial testimony as relating to past or present actions.

Even if the court should have construed the evidence as though Freier represented his intent not to use corporate assets for his personal benefit *in the future*, such a misrepresentation may still be actionable fraud.  A material promise to perform in the future "made with the intent to defraud and without the intent to perform . . . constitutes actionable fraud."  McDonald v. Johnson & Johnson, 722 F.2d 1370, 1379 (8th Cir. 1983) (applying Minnesota law); see also Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974).[2]  The evidence at trial showed that Freier used a

_____

[2]We note that the elements of fraud under § 523(a)(2)(A) are determined by reference to "the dominant consensus of common-law jurisdictions, rather than the law of any particular State."  Field, 516 U.S. at 70 n.9; see also In re Dallam, 850 F.2d 446, 449 (8th Cir. 1988) (Section 523(a)(2)(A) "has been construed to incorporate the elements of common law fraud . . . .").  The parties erroneously assume that Minnesota law applies.  Nonetheless, Minnesota law is consistent with the consensus of common-law jurisdictions.  See, e.g., 37 Am. Jur. 2d Fraud and Deceit § 90 ("The prevailing rule followed by most of the courts is that fraud may be predicated on promises made with a present intention not to perform them or, as the rule is frequently expressed, on promises made without an intention of performance . . . .").

substantial amount of corporate assets for his personal benefit throughout 2005, including during the time period that he negotiated the settlement agreement with R&R. Thus, the evidence supports a conclusion that Freier's representation was false regardless of whether he spoke in the present or future tense.

Freier also argues that he intended to make payments to R&R, and thus his promise to pay the debt was not false when it was made. The BAP agreed with Freier on this point, emphasizing that Freier reduced his outstanding debt by thousands of dollars by complying with the settlement agreement through July 2005. According to the BAP, such payments are inconsistent with a finding that Freier had no intent to pay the debt. However, R&R's claim under § 523(a)(2)(A) is not dependent on Freier's representation that he intended to make payments. Instead, R&R's claim is premised on Freier's false representation that he was paying off T.F.'s debts before he was taking personal draws. The bankruptcy court found that Freier knew the statement about drawing funds from T.F. was false, which, for the reasons stated previously, was not clearly erroneous.

Freier also maintains that R&R did not justifiably rely on his representation about not drawing funds. Justifiable reliance is an intermediate standard between actual reliance and reasonable reliance. See Field, 516 U.S. at 70–73. Reliance can be justifiable even though an investigation would have revealed the falsity of a representation. Id. at 74–75. However, a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. at 71 (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).

The bankruptcy court found that R&R relied on Freier's representation about not taking draws from T.F. by forgoing collection efforts, signing the settlement agreement, and continuing to supply T.F. with materials and services on credit. R&R knew that Freier's method for bidding jobs included at least a 100 percent mark-up from the cost of materials. From those figures, R&R concluded that T.F. should have

been able to pay for the materials used and make payments on the debt owed to R&R, so long as Freier did not use corporate funds for personal use and did not take a profit. Thus, the evidence supports the bankruptcy court's finding that R&R relied on Freier's representation about taking draws.

Freier argues that reliance on his representation about putting the corporation first was "patently absurd" because T.F. was nearly $160,000 in debt to R&R already. Essentially, Freier argues T.F.'s debt was a warning sign that Freier was misusing corporate assets, and R&R should not have trusted Freier's representations to the contrary. This argument, however, is one for the trier of fact. Although the bankruptcy court was permitted to accept Freier's argument, we decline to hold that it was required to do so. As such, the bankruptcy court's finding was not clearly erroneous. See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

We affirm the bankruptcy court's determination that Freier's debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(A). We also affirm the bankruptcy court's decision to pierce T.F.'s corporate veil and to treat T.F.'s debt as Freier's personal debt. See Barton v. Moore, 558 N.W.2d 746, 749 (Minn. 1997) (test for piercing the corporate veil). Accordingly, we need not reach the bankruptcy court's alternative bases for holding Freier's debt non-dischargeable.

III.

For the foregoing reasons, we reverse the judgment of the Bankruptcy Appellate Panel.

_____