**In re David L. and Mona L. JUVE, Debtors.**

**David A. Heide, Leah T. Heide, and Kaia E. Heide, Plaintiffs,**

**v.**

**David L. Juve d/b/a Juve Buying Services, d/b/a Imports Plus, Inc., and Mona Juve, Defendants.**

**Bankruptcy No. 09–60966.**
**Adversary No. 09–6057.**

United States Bankruptcy Court, D. Minnesota.

Sept. 28, 2012.

David L. Johnson, McNair Larson & Carlson, Fargo, ND, for Debtor.

## ORDER FOR JUDGMENT

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the court for trial following reversal by and remand from the Bankruptcy Appellate Panel for the United States Court of Appeals for the Eighth Circuit. Appearances are noted in the record. At the conclusion of the trial, the court allowed the parties time to file supplemental briefs. The court now being fully advised makes this order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

During the initial proceedings, this court: (1) granted summary judgment to plaintiff, David A. Heide, holding the debt in the amount of $400,000 nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); denied the plaintiffs' motions for summary judgment under § 523(a)(4) and (a)(6), and granted summary judgment to the defendants on those counts; dismissed the plaintiffs' § 523 claims against Mona Juve; and dismissed the motion for summary judgment filed by Kaia and Leah Heide. Allegations under § 727(a) were to proceed to trial.

After this court entered its summary judgment order, the parties to the adversary proceeding entered into a stipulation for the entry of a money judgment and a judgment of nondischargeability, and they also agreed to the dismissal of the remaining claims that were scheduled for trial. They stipulated that the plaintiff would have a judgment against the debtor in the amount of $400,000; that the judgment would be excepted from the debtor's discharge under § 523(a)(2)(A); that all re-

maining counts of the complaint would be dismissed with prejudice; and that the debtor's appeal rights would be preserved. On January 19, 2011, the bankruptcy court approved the stipulation and entered its order and judgment in favor of the plaintiff in the amount of $400,000 and dismissed all remaining counts in the complaint with prejudice.

Following the disposition on appeal, this court set the matter for trial for determination pursuant to 11 U.S.C. § 523(a)(2)(A). For the reasons set forth below, the court finds that judgment for the plaintiff is appropriate and shall be so entered.

## I. FINDINGS OF FACT

The thorough trial held in this matter following the disposition on appeal has resulted in a clear factual record somewhat more developed but not materially different from the first findings of fact revealed by the record on summary judgment. The court recites an exceedingly complete factual background here, for purposes of total transparency and hopefully a higher level of reliability in the analysis and conclusion.

David Juve was in the car sales business throughout his adult life. David Heide was a school teacher and a football coach. While Heide was a teacher, he also worked various construction jobs, a paper route and, eventually, Heide started selling vehicles at Russ Honda. Heide was a hard worker and a diligent saver and, over a long period of time he amassed a substantial savings.

During the 1990s Heide worked part-time (and later full-time) for David Juve at the used car dealership "Imports Plus." At all relevant times, Juve retained all the titles and paperwork—for vehicles purchased and sold through his ownership or otherwise transacted under his direct management and authority—at his home, and his wife, Mona Juve, performed the bookkeeping.[1]

In 1998, Juve approached Heide about funding the purchase of specific vehicles for the Imports Plus lot. Because of Juve's prior bankruptcy, Juve was not able to get a high enough line of credit to purchase any more cars on his own credit. Heide thought that sounded like a good opportunity and a safe investment. At first Heide began to finance purchases of used cars to sell one car a time, with interest payments to be made to him while and until the car remained unsold on the lot. The relationship at the beginning was mutually beneficial. Juve could purchase more cars, and made a profit from the "Heide cars" that were sold on the Imports Plus lot. Heide received a 10% return on his investments, one by one, one automobile transaction at a time.

Over the course of the next three years, Heide and Juve continued to sell Heide's cars on the Imports Plus lot. Neither Dennis Borgen, the owner of Imports Plus, or the other sales people at the dealership, knew that Heide and Juve were selling Heide's cars. They were independent contractors at the time as were other individuals selling cars on the Imports Plus lot.

Later, in 2001, Juve needed capital. He approached Heide about simplifying the deal so that Heide would receive a flat monthly interest rate plus periodic commissions at the time of sales. At the time, the principal outstanding amount that Heide had loaned to Juve to purchase vehicles for the Imports Plus lot amounted to $187,000.

---

**1.** Mona Juve was not involved in the transactions between David Heide and David Juve except in the background as the bookkeeper. There is no basis to consider the debts at issue here as her liabilities.

Heide was not concerned about being repaid his principal investment because he could see the cars on the lot and he knew that his cars were being sold. And, because Juve repeatedly represented to Heide that Heide owned the cars on the lot free and clear, Heide continued to extend and re-extend the funds for Juve's continued use and re-investment into the purchase and resale of cars.

Heide always received his interest payments on time and had no reason to believe that Juve was not credible. Moreover, there was a relationship of personal trust between Heide and Juve—they were good friends, had known each other a long time, often visited each other's families, did not feel the need to develop or observe business formalities between them, and had successfully maintained a friendly informal financing and purported investment arrangement for several years.

Heide therefore agreed to change the arrangement to ongoing financing of multiple vehicles for a monthly interest payment on the total aggregate outstanding balance. This went on for many years. There was never a written agreement between the parties until very late in the already deteriorating relationship and financial situation.[2]

Around 2001, when Heide and Juve's agreement changed, Juve also became an owner of the Imports Plus business. However, the vehicle purchasing relationship that Heide and Juve had did not change. Borgen was still an owner of Imports Plus, and he remained uninformed and unaware of the arrangement between Heide and Juve.

In 2003 and 2004, Heide disbursed two more $50,000 loans to Juve, in addition to the revolving ongoing extension of credit based on previously loaned amounts, bringing the total amount of outstanding debt owed by Juve to Heide to $300,000. Juve continued to use that money through 2008. In other words, as Heide vehicles were sold, instead of being repaid the principal as was his right at any particular time, Heide re-extended the credit and use of the proceeds to Juve, and Juve repeatedly borrowed those funds anew, all based upon Juve's ongoing assertions of the equity and liquidity of the Heide inventory sufficient to satisfy the entire balance of funds owning to Heide.

At the time, Borgen remained unaware that Juve and Heide were selling vehicles financed and purportedly owned by Heide on the Imports Plus lot. Even after Juve was an owner of Imports Plus, Borgen remained unaware. Heide conducted the lending transactions with Juve individually. He made the loan checks payable to Imports Plus, and Juve ran the funds through the business accounts, as he had always done from the very first transaction with Heide. Whenever one of Heide's vehicles was sold, the money would be rolled over into the purchase of the next vehicle, or, as it eventually turned out, used for other purposes at Juve's discretion contrary to the agreement of the parties. Heide continued to receive his interest payments.

Juve continued to represent to Heide regularly throughout each year of the relationship that Heide owned all or almost all the vehicles on the lot, and that the inventory was always sufficient to entirely cover Juve's debt to Heide. When Heide specifically asked Juve if his investment was

---

2. David Heide's daughter, Kaia Juve, also participated in lending funds to Juve to buy vehicles for resale. Her $50,000 loan to Juve was made through her father David Heide. She never spoke with David or Mona Juve and cannot reasonably claim that Juve made any representations to her.

safe, Juve placed his hand on Heide's shoulder and expressly represented to him that his investment was always safe.

In 2005, Heide asked Juve if the vehicle titles could be kept at Imports Plus so that customers could obtain titles faster. But, Juve claimed that he wanted to keep the titles at his home in case a fire happened at the business. Heide asked Juve to make Heide a beneficiary of a life insurance policy on Juve's life to protect Heide's investments, and Juve agreed to execute the necessary documents, but Juve did not follow through at that time.

Juve claims that it was not until 2006 that the business really began to fail, and that prior to 2006 Heide's money had all been invested in purchasing cars to sell on the Imports Plus lot. Juve concedes that Heide's money was not to be used for operating expenses of the Imports Plus business or for any expenses, and was only to be used to make unencumbered inventory vehicle purchases, but that the business in fact consumed the funds loaned to him by Heide.

According to Juve, Imports Plus lost $300,000 of Heide's money in a three year period. Heide credibly testified that he was still at Imports Plus every day during that period of time, selling the same amount of cars, and that nothing had changed with the commission structure or overhead at Imports Plus. Juve also acknowledged that the overhead had not changed, and that he knew what he had to obtain as a bottom line on each vehicle in order to make a profit. Juve failed to explain specifically how Heide's funds were ultimately dissipated; however he denied losing the funds by gambling.

Juve admits that he repeatedly represented to Heide that Heide could collect on his investments without a loss anytime by simply liquidating the vehicles. Juve admits that he began encumbering the vehicles by 2007. Juve admits that he encumbered the vehicles knowing that he was compromising Heide's investments in the vehicles and that he was misrepresenting the equity or lack of equity in the vehicles and misusing the funds loaned by Heide to fund expenses other than unencumbered vehicle purchases. Juve admits that he never disclosed to Heide that Juve began encumbering vehicles. By 2008, Juve was in sole control of the checking account at Imports Plus.

In October 2008, Juve approached Heide about purchasing specific vehicles from a Las Vegas auction. Juve told Heide that he was going to Las Vegas, that the vehicle prices had dropped, and that he was going to purchase certain vehicles that they could resell when the prices went up. Heide issued two checks to pay for the Las Vegas cars, in the combined total amount of $50,490.

Juve traveled to Las Vegas, returned, and falsely represented to Heide that he had purchased six specific vehicles. Juve lied to Heide that the vehicles were safely held in Las Vegas under security at the Manheim Auction pending delivery to the Imports Plus lot. When Heide asked Juve about a specific Pontiac Grand Prix supposedly included in the group of six automobiles, and earmarked for Heide's daughter, Kaia, Juve reported that the Grand Prix was indeed the nicest vehicle of the six that Juve said he had purchased. In reality, Juve took Heide's money, never purchased the vehicles, and spent the funds on other unknown, unrelated expenses.

By the end of December 2008, Heide began to be seriously concerned. The Las Vegas vehicles had not turned up, and purchasing customers were not receiving vehicle titles. Around Christmas 2008, Juve cleaned out his office while Heide and

the other salesman were not present. Heide went to Juve and asked for partial repayment of his principal investment, and Juve simply declined saying the timing was not good.

Heide thereafter traveled to Florida to consult Imports Plus' other owner, Dennis Borgen. During this meeting, Borgen learned for the first time that Heide had been lending money to Juve to purchase vehicles to place on the Imports Plus lot. Borgen called Juve to inquire about the situation. Juve confessed that he lost it all and acknowledged that he had been lying for a long time.

On January 18, 2009, Heide met with Juve to discuss the situation. Heide complained to Juve that Juve had stolen Heide's life savings, and Juve merely stated that it was not intentional, and that he would still try to repay the debt. The next day, Heide asked Juve about the life insurance policy previously discussed in 2005. Heide learned that Juve had never made Heide a beneficiary, and in order to make some effort to acknowledge and secure his personal debt to Heide, Juve did that day make Heide the beneficiary of the policy.

Heide requested a second formal meeting and provided a document for Juve to sign. The meeting occurred on January 29, 2012, but Juve refused to sign the first document because it was too long and too specific. Instead, Juve signed the following statement expressly acknowledging his personal, individual liability on the debt to the Heides, included here in pertinent part:

I, Dave Juve, have borrowed $300,000.00 (three hundred thousand dollars) from Dave and Leah Heide over the past 11 ½ years. I have also borrowed $50,000.00 (fifty thousand dollars) from their daughter, Kaia Heide, in 2007. I promised to pay the Heides 10% interest annually, payable monthly. These interest payments have been paid without interruption for these last 11 ½ years. I, Dave Juve, took out a $200,000.00 life insurance policy on myself to protect the money borrowed from the Heides. Dave Heide is listed as the beneficiary in the case of my death. Money owed to the Heides in excess of the $200,000.00 policy would be covered by liquidating my assets.

I, Dave Juve, told Dave Heide that I bought six cars—[ ... ] On November 4, 2008, Dave Heide wrote check number 10431 for $26,250.00 and check number 10432 for $24,240.00 to cover the cost of these six cars. [ ... ] Our agreement was that any profit or loss on the sale of these six cars would be shared equally between Dave Juve and Dave Heide. But in January 2009, Dave Heide learned that I, Dave Juve, had not done what we had agreed upon. I did not use the $50,490.00 for these six cars; I used the $50,490.00 for other purposes. [ ... ]

As of January 2009, I, Dave Juve, owe Dave and Leah Heide $350,490.00 (three hundred fifty thousand four hundred ninety dollars) and their daughter Kaia Heide $50,000 (fifty thousand dollars). I, Dave Juve, am obligated to pay back the money ($400,000.00) that was borrowed from Dave, Leah, and Kaia Heide.

Juve now claims that he signed the statement under duress, but his claim is not credible and not supported by the factual circumstances, including the long standing friendship between Juve and Heide, Juve's long standing and expressly and meaningfully repeated misrepresentations and scheming, his many other admissions and concessions noted in the record and made in these proceedings, and the fact that the meeting was not confrontational, was held in the open at Imports Plus while other salespeople were present

in the offices, and Juve was free to seek counsel, decline to sign, or simply adjourn or leave the meeting.

Over the course of the parties' relationship, Juve engaged in a continuous and repeated misrepresentation that Heide owned almost every vehicle on the lot, that the cars on the lot were unencumbered, and that Heide could sell the cars if he wanted to get his principal returned. Juve often represented to Heide that Heide could look out upon the lot any time and observe the inventory for himself as proof of available collateral. In fact, not only were many or most of the vehicles encumbered at any given pertinent time, other members of the dealership, including Jeff Neppl and Dennis Borgen, also each owned vehicles on the lot as well. Eventually, and in the end, neither the equity of vehicles nor any other resources of the dealership existed to repay the total $350,000 plus debt to David Heide.

Heide loaned $350,490 to Juve for the exclusive, limited purpose of purchasing cars to place on the Imports Plus lot, such that the entirety of Heide's investment was at a minimum always reflected by equivalent available vehicle equity, but Juve routinely used that money for other purposes. Juve misrepresented the material facts of the transaction and financing structure to Heide over and over in order to borrow the funds from Heide over and over in order to continuously re-obtain an extension of the credit and continuously maintain dominion over the use of those funds and related collateral.

The Las Vegas transaction between David Heide and David Juve fell outside the norm of their ongoing financing relationship in October 2008. Juve told Heide that there were six particular vehicles available to buy in Las Vegas and that they would appreciate in value quickly for a profitable resale during the first quarter of the new year. Heide loaned $50,000 to Juve to buy the Las Vegas cars. Juve consumed the proceeds, but never purchased the vehicles. Nevertheless, this transaction is less an anomaly than merely the breaking point in the overall structure of Juve's scheme; the central elements of the fraud are not different. Juve's misrepresentations and Heide's reliance in this final failed transaction were typical of the established dynamic.

## II. DISCUSSION

### Piercing the Corporate Veil

■ "In Minnesota, a two-part test is required to pierce the corporate veil and reach a corporation's shareholder." *See In re Hoffmann*, 475 B.R. 692, 699 (Bankr. D.Minn.2012), citing *Tr. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719, 731 (8th Cir.2007). "The first part of the test considers whether the corporation is the alter ego or a mere instrumentality of the shareholder." *Id.* "Several factors must exist to make such a finding including: 'insufficient capitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds, nonfunctioning of officers and directors, absence of corporate records, or existence of corporation as a mere façade for individual dealings.'" *Hoffmann*, 475 B.R. at 699, citing *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979).

■ "The second prong of the test requires a 'finding of injustice or fundamental unfairness.'" *Id.* "Both prongs of the test must be satisfied to pierce the corporate veil." *Id.* "The burden to demonstrate the corporate veil should be pierced belongs to the moving party." *Hoffmann*, 475 B.R. at 699, citing *Agristor*

*Leasing v. Guggisberg,* 617 F.Supp. 902, 906 (D.Minn.1985).

When Heide began giving Juve money to purchase vehicles for the Imports Plus lot, Juve was not even an owner of Imports Plus but only an independent contractor. Heide was also just an independent contractor at the time. Moreover, the one person that was an owner of Imports Plus throughout the entire time that Heide gave money to Juve was Dennis Borgen, and he did not know about Heide giving money to Juve for the Imports Plus lot until 2009. Imports Plus cannot be said to be the borrower in this situation by any sensible characterization.

Neither Heide nor Juve considered Imports Plus to be anything other than a platform for their personal individual transacting. Heide wrote the checks out to Imports Plus, and at least twice Imports Plus was indicated as the source of Heide's interest income. But, the business was essentially only an accounting mechanism for their private affairs, and particularly a way for Juve to insulate or conceal his conduct and his role in manipulating the corporate entity to facilitate his individual scheming.

In any event, Juve has conceded his personal liability. He took out a personal life insurance policy to protect Heide's investment in 2005 and when the truth was out he did follow through and make Heide the beneficiary of the policy in January 2009. Juve also acknowledged his personal liability when he signed the handwritten note at the meeting with Heide and his wife in January 2009, his present claim of duress notwithstanding. Moreover, Juve had his wife do the bookkeeping and he maintained his transaction records at his home, not at the Imports Plus offices. He also failed to disclose the arrangement with Heide to Borgen, the original owner of the business.

Juve used Imports Plus as a corporate facade to facilitate and conceal his individual dealings with Heide. Corporate formalities were nonexistent in these transactions. But for Heide writing out the loan checks to Imports Plus, there would be no remotely viable claim to a corporate shield in these facts. If the corporation had officers and directors functioning, they were not functioning with respect to the financing between Heide and Juve at any time from the first vehicle bought and sold to the collapse of the sham in January 2009.

The fundamental unfairness of a determination that Imports Plus is the debtor instead of Juve himself is patent—Heide would have no reach and no remedy with respect to the only true party on the other side of his so called investments. Juve would have an excessively powerful use of a business entity that had essentially no valid role whatsoever in the transactions with Heide. It is accurate that eventually Juve was an owner of Imports Plus, but the company was not really or properly involved or behind the financing transactions with Heide. Piercing the corporate veil, if there is a veil here, is appropriate and necessary.

*Fraud is a Tort Which Creates Personal Liability*

However, "[e]ven if the liability was not taken on individually, [ . . . ] fraud justifies piercing the corporate veil." *Hoffmann,* 475 B.R. at 699, citing *Victoria Elevator Co. of Minn. v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979). "Piercing the corporate veil is equitable in nature and is available when a shareholder has engaged in fraudulent conduct or wrongful use of the corporate form." *Hoffmann,* 475 B.R. at 699, citing *In re Intelefilm Corp.,* 301 B.R. 327, 331 (Bankr. D.Minn.2003).

Even if piercing the corporate veil is not viable against Juve, he is still liable for his own fraud. "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." *Hoffmann,* 475 B.R. at 699–700, citing Restatement (Second) of Torts: Liability for Fraudulent Misrepresentation § 525 (2011).

█ In other words, even if because Heide disbursed funds to lend to Juve by writing checks out to Imports Plus, and even if it could not reasonably be said that the veil could be pierced to reach Juve personally and individually, if he committed fraud in the transactions with Heide, then Juve is personally liable to Heide for Heide's pecuniary loss. *Hoffmann,* 475 B.R. at 700.

"The requirements to hold an individual liable for fraudulent misrepresentation under the Restatement (Second) of Torts are a subset of the Eighth Circuit elements necessary for an exception to discharge under § 523(a)(2)(A)." *Hoffmann,* 475 B.R. at 700. "A finding that the elements of § 523(a)(2)(A) have been met is a finding that a tort has been committed and individual liability may attach." *Id.*

Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

*See* 11 U.S.C. § 523(a)(2)(A).

The analysis under § 523(a)(2)(A) is well settled in the Eighth Circuit:

█ "Section 523(a)(2)(A) of the Bankruptcy Code prevents persons from committing actual fraud and then wiping away their resulting debt." *See In re Freier,* 604 F.3d 583, 587 (8th Cir.2010), citing *In re Miller,* 276 F.3d 424, 429 (8th Cir.2002). "To obtain a determination that debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

1. The debtor made a representation.

2. The debtor knew the representation was false at the time it was made.

3. The representation was deliberately made for the purpose of deceiving the creditor.

4. The creditor justifiably relied on the representation.

5. The creditor sustained the alleged loss as the proximate result of the representation having been made."

*Freier,* 604 F.3d at 587, citing *Burt v. Maurer (In re Maurer),* 256 B.R. 495, 500 (8th Cir. BAP 2000); *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987), as modified by *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (requiring justifiable reliance); *see also In re Ungar,* 429 B.R. 668, 673 (8th Cir. BAP 2010).

█ "Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Hoffmann,* 475 B.R. at 700, citing *Merchs. Nat'l Bank of Winona v. Moen (In re Moen),* 238 B.R.

785, 790 (8th Cir. BAP 1999) quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995).

False representation may be made, for purposes of § 523(a)(2)(A), by omission. *See In re Lane*, 104 Fed.Appx. 608, 609 (8th Cir.2004), citing *In re Maurer*, 256 B.R. 495, 500 (8th Cir. BAP 2000); *In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir.1987) (deceit may be by omission or commission), abrogated on other grounds; *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See also In re Eccles*, 407 B.R. 338, 342 (8th Cir. BAP 2009) (silence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A)), citing *Van Horne*, 823 F.2d at 1288. "A false representation under § 523(a)(2)(A) must relate to a past or present fact." *Hoffmann*, 475 B.R. at 700, citing *Freier*, 604 F.3d at 587.

"To establish fraud, a representation must be made deliberately and intentionally with the intent and purpose of deceiving." See *In re Glen*, 427 B.R. 488, 494 (8th Cir. BAP 2010), citing *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 513 (8th Cir. BAP 2006). "Intent can be inferred from circumstantial evidence." *Hoffmann*, 475 B.R. at 701, citing *Moen*, 238 B.R. at 791. "[A] determination of malevolence is not required for non-dischargeability under § 523(a)(2)(A)." *Id.*

"The Supreme Court set forth a minimal standard of justifiable reliance in cases for actual fraud under Bankruptcy Code section 523(a)(2)(A)." *Ungar*, 429 B.R. at 673, citing *Field*, 516 U.S. 59, 116 S.Ct. 437. "Justifiable reliance is a lower standard than reasonable reliance." *Ungar*, 429 B.R. at 673, citing *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 423 B.R. 309, 314 (8th Cir. BAP 2010) (citing *Field*, 516 U.S. 59, 116 S.Ct. 437). "Even when an investigation would have revealed the falsity of the representation, reliance may be justifiable." *Ungar*, 429 B.R. at 673, citing *Freier*, 604 F.3d at 587–88 (citing *Field*, 516 U.S. at 74–75, 116 S.Ct. 437). "[A] creditor 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* "[T]he Supreme Court defined justifiable reliance as the standard applicable to a victim's conduct where, 'under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *See In re Church*, 328 B.R. 544, 547 (8th Cir. BAP 2005), citing *Field*, 516 U.S. at 71, 116 S.Ct. 437.

## Juve's Representations

There is no shortage of representations made by the debtor-defendant in this case. From the outset, Juve made express representations to Heide about the value and security of the loans as an investment, about the value and equity of the vehicles being purchased with the loan proceeds from Heide, about the constant availability of assets to fully satisfy the outstanding debt to Heide on demand. The representations Juve made were present statements of material fact—and he made assurances, not promises, about specific uses of funds and about the immediate inventory ready to convert to cash to satisfy the principal.

Juve made representations at the beginning of the lending relationship with Heide, and repeatedly throughout the nine years of transactions. Sometimes he made the representations of his own inclination, unsolicited. Sometimes he made the representations in reply to a specific inquiry

by Heide. The fact that the representations Juve made to Heide over the years were often repetitions of earlier made representations does not, in these circumstances, undermine the substance, strength or materiality of any one of the representations at any time—each utterance was a statement with respect to the facts at the time uttered and was pertinent to the immediate act of continuing to use principal funds or assets in the manner of an extension of credit, or, in some instances, for new infusions of capital.

Sometimes Juve made representations by omitting essential material information, such as upon the numerous occasions when he would inform Heide that Heide owned most or all of the cars on the Imports Plus lot but he would neglect to disclose that the vehicles were encumbered, or when he would initiate the extension of the financing arrangement but then not disclose that he was in fact not using the proceeds from the sales of Heide cars to purchase additional Heide cars and instead was using the funds for other purposes. Similarly, as the scheme began to destabilize, Juve continued to represent that the financing arrangement could continue as usual because the process was operating as usual, when in reality the variables and the practice had changed in meaningful and serious ways with his misuse and misappropriation of the funds, encumbering assets, failing to deliver titles, and other such omitted essential details.

### Juve Knew His Representations Were False When He Made Them

Juve has admitted throughout these proceedings, and during the meetings between the parties prior to bankruptcy, that he had been "living a lie" for a long time. He concedes that he knew he was lying to Heide by falsely representing how Heide's funds were being used, that Heide owned all or most of the cars on the Imports Plus

lot, that the Heide cars were unencumbered, and that the equity of the vehicles was sufficient to repay Heide's complete principal investment. There is no question that Juve knew in precise detail the falsity of his representations to Heide.

Indeed, Juve was the only person involved in the transactions with Heide, and the only person of several involved in the Imports Plus business, who had the control over the critical information necessary to know the truth about the facts essential to the structure, process and wherewithal of the system he had constructed to use Heide's money to such an extent and for such a long time, on a repeating basis. The owner of Imports Plus did not have any idea for eleven years that Juve was obtaining funds from Heide and neither did the other sales members, and Juve maintained control over all of the records involved at his home.

### Juve Made the False Representations Deliberately to Deceive Heide

Once Juve knew that the vehicles did not amount to assets sufficient to repay his principal outstanding debt to Heide, his representations to Heide to the contrary were made not merely to promise Heide eventual repayment or to lull him into comfort and inaction to prevent demand and collection, but to actually continue to use the funds derived from the repeated rebirth of the financing arrangement to maintain a cash flow. In other words, the ongoing misrepresentations were necessary in order to maintain ongoing access to Heide's funds.

Juve knew that if he told Heide the truth, about any one of the aspects of the situation unfavorable to the security of Heide's principal investment, then Heide would immediately disallow the financing plan to persist and he would demand a liquidation of all available assets to mitigate his losses and collect the repayment

in full. Precisely in order to avoid that scenario, Juve lied about how the funds were being used and about the equity available in the inventory. His misrepresentations were deliberately designed to deceive Heide into believing that the system they had initiated together was operating successfully as agreed upon and intended, so that Heide would continue to re-extend Juve's use of the loaned funds.

*Heide Justifiably Relied upon Juve's False Representations*

Juve has always been in the business of selling cars—of buying and selling vehicles. He is a seasoned car salesman and car dealer business professional. Heide, on the other hand, was a professional school teacher first, and car salesman second. He was industrious and hard working and took on extra work in addition to teaching in order to maximize his personal financial wherewithal. But, he is not a sophisticated practitioner of business and not a sophisticated financial manager.

While a common enough occurrence, as the court has observed too many times over the years, investing one's hard earned life savings in an entirely informal manner on the basis of personal trust is simply never a sensible act. Heide is a thoughtful and basically careful person, but not sophisticated in the manner that would have been necessary to prevent the loss sustained with his trust placed in a person highly adept at moving money, rotating and hiding risks, and inclined to dishonor and trickery.

Juve repeatedly and continuously went out of his way to materially infer and lie outright to Heide in order to sustain and renew Heide's trust and to sustain and renew unlimited ongoing access to use Heide's principal and additional funds. Heide had no reason to believe there was a problem until it was blatantly obvious and too late. Not until buyers were not receiving titles from vehicle sales in a timely manner was there even a hint of what by then had already become an established pattern and practice of Juve plundering Heide's resources.

In addition, the parties enjoyed both a successful friendship and a successful early history of successful single transactions, followed by what may have initially been and did seem to continue to be a successful transition to a renewing financing arrangement—Juve never failed to deliver an interest payment to Heide, the lot was covered with cars, the cars were selling as usual, and no one else onboard Imports Plus had or demonstrated any concerns about Juve or the business. Heide's reliance on Juve's representations was entirely justified.

*Heide Sustained the Loss as the Proximate Result of Juve's False Representations*

Juve approached Heide in 1998 about funding the purchase of vehicles to place on the Imports Plus lot. The relationship started with Heide giving Juve money for one car at a time. In 2001, the structure of the arrangement changed to Heide providing continuous financing. Heide had loaned Juve $187,000, and began to increase the funding for a monthly interest return on the principal and the vehicles purchased with the loan proceeds to serve as Heide's on-demand collateral in equivalent value.

Heide agreed to do business as a lender in this fashion because, besides earning an interest dividend on the funds loaned, Juve represented: (1) that the funds loaned would be used to purchase vehicles to sell at a profit at Imports Plus; (2) that Heide would be the sole, free and clear owner of all the vehicles purchased with the funds he loaned to Juve; and (3) that at any time Heide could collect his entire principal in-

vestment by liquidating the cars. Juve's representations and the trust between them caused Heide to lend money to Juve as a safe investment.

In order to renew and perpetuate the arrangement, Juve regularly represented to Heide at various times during each year: (1) that Juve was using funds loaned from Heide, either newly disbursed from Heide or by reinvesting principal recovered from sales, to purchase additional inventory to sell; (2) that Heide did in fact own every vehicle on the lot, unencumbered, with equity sufficient to fully satisfy the outstanding balance owed to Heide; and (3) that at any time the value of his principal investment was easily recoverable from that inventory. Each any every time Juve made these representations he was either literally borrowing anew from Heide, as when Heide would increase the principal debt by loaning additional funds, or Juve was obtaining a renewal of the extension of credit, new and continuing access to use Heide's money, and he was delaying and avoiding demand and collection from Heide.

Eventually, the arrangement degenerated into a scam because those material representations were no longer true and Juve was knowingly and intentionally deceiving Heide in order to maintain the facade. Juve began encumbering vehicles on the lot knowing that the only way Heide could recover was through unencumbered vehicle sales. Juve never told Heide that he was encumbering the vehicles. Juve admits that he did not use Heide's money for the intended and agreed upon purpose of purchasing vehicles. At any of the times when Juve made the misrepresentations to Heide, had Juve been truthful, Heide would have pulled the plug. Instead, Juve lied, and his ongoing scheme of consistently and repeatedly misrepresenting or concealing the truth caused Heide to continue to loan new funds and to repeatedly release the principal for renewed lending. Juve's misrepresentations constitute the proximate cause of the heavy loss Heide ultimately sustained.

*Conclusion*

As was already clear from the record on summary judgment, made even more readily apparent following a thorough trial:

When the transactional relationship between David Juve and David Heide began, it was a one car at a time process, and whatever representations might have been made or not, those deals were self resolving. When the relationship developed into a sort of informal floor plan financing of Juve's dealership inventory, the process changed fundamentally. Heide received a monthly interest payment on the running outstanding balance of his loans to Juve, regardless of which cars were bought and sold. During this time, it is indisputable (and in fact not meaningfully controverted) that Juve represented to Heide, either overtly or by omission, that the available equity in the inventory was at any given time sufficient to satisfy total outstanding liability to Heide.

At some point, probably from the outset of the transition to the ongoing financing arrangement, because that's when Juve needed the capital infusion from Heide, it was not the truth that the inventory if liquidated would cover Heide's loans. Juve knew the truth, or should have known because he and his wife had exclusive knowledge, possession and control over the records. Nevertheless, Juve maintained and continued borrowing from Heide, without disclosing accurate information about the automobile values and equity or lack thereof, and without disclosing the real risks to Heide of his ongoing fi-

nancing. Heide's reliance on Juve was justifiable—there were cars on the lot and he was receiving monthly interest payments. He did not have access to the books, but that was nothing new. Cars were being bought and sold and the dealership appeared to be operating normally. There were no red flags he had a duty to recognize.

The loan made specifically for the six vehicles in Las Vegas is a classic § 523(a)(2)(A) scenario in all respects. But, rather than undermine the strength of the argument as it relates to the entire debt established by the long term financing, it merely demonstrates that, by October 2008, Juve had long since been in trouble. The Las Vegas vehicles deal was simply Juve's final slide to complete business dysfunctionality.

While the record after trial has established the necessary elements by an overwhelming preponderance, the result is nonetheless the same (but for the error on summary judgment, here corrected, of inadvertently including the $50,000 debt owed to Kaia Heide as part of the total nondischargeable debt to David Heide).

### III. DISPOSITION

IT IS HEREBY ORDERED:

1. David Juve's debt to David Heide, in the amount of $350,490, arising out of funds obtained from Heide based upon representations made by Juve to Heide, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), and excepted from the discharge in main case 09–60966;

2. Plaintiffs' complaints under 11 U.S.C. § 523(a)(4) and § 523(a)(6) are dismissed with prejudice;

3. Kaia and Leah Heide's complaints in this matter are dismissed with prejudice;

5. Plaintiffs' claims against defendant Mona Juve are dismissed with prejudice; and

6. The complaint as pleaded under 11 U.S.C. § 727(a) is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.